53 Cal.Rptr. 168]

[Crim. No. 5181. First Dist., Div. One. Aug. 4, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. MAURICE H.
HARDEMAN, Defendant and Appellant.

Belli, Ashe, Gerry & Ellison, Melvin M. Belli and Frederick A. Cone for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Robert R. Granucci, Deputy Attorney General, Louis B. Bergna, District Attorney, and William P. Hoffman, Assistant District Attorney, for Plaintiff and Respondent.

SIMS, J.—Defendant has appealed from an order granting him probation[1] following jury verdicts which convicted him of conspiracy to pervert and obstruct justice and the due administration of the laws in violation of subdivision 5 of section 182 of the Penal Code, and of conspiracy to commit arson in violation of subdivision 1 of that section.

On October 8, 1964, an indictment was returned charging defendant and one Wickholm with conspiracy to pervert and obstruct justice in Count I, defendant and Wickholm and one Sherman with arson in Count II, and the same three with conspiracy to commit arson in Count III. The motion of this defendant to have the indictment set aside under the provisions of section 995 of the Penal Code was denied, and his general and special demurrer to Count I of the indictment was overruled. Following the entry of not guilty pleas, the matter was regularly set down for trial and tried commencing January 26, 1965. On March 9, 1965, after 23 days of trial and approximately 19 hours of deliberation, the jury returned verdicts finding defendant and Wickholm guilty as charged in Count I; Wickholm and Sherman guilty as charged in Count II, and all three guilty as charged in Count III. Disagreement

---

[1]The notice of appeal also purports to specify that the appeal is from the judgment, although imposition of sentence was suspended, and from the orders which respectively denied a motion in arrest of judgment and a new trial. There is no warrant for such appeals and they must be dismissed. (See Pen. Code, § 1237; and Witkin, Cal. Criminal Procedure, §§ 649 and 653, pp. 642 and 644-645.)

was reported as to the guilt of this defendant on Count II and the court ordered a mistrial as to him on that count. On March 26th imposition of sentence was suspended and the defendant was admitted to probation. This appeal ensued. No appeal has been taken by Wickholm or Sherman.

Defendant seeks review of the following matters: (1) the order overruling his demurrer to Count I of the indictment; (2) the order denying his motion to dismiss the indictment under the provisions of section 995 of the Penal Code; (3) rulings in regard to the admission of testimony, particularly, (a) a monitored and recorded telephone call between defendant and a woman then living with Wickholm who subsequently became his wife, and (b) extrajudicial declarations of the defendant and of his codefendants; (4) the sufficiency of the evidence to support the verdicts; (5) alleged errors in giving and refusing to give instructions; (6) alleged prejudicial misconduct of the prosecutor; and (7) the order of the court which allegedly subjects him to double punishment.

An examination of the facts bearing on the foregoing issues and the principles of law applicable thereto, as hereinafter set forth, leads to the conclusion that the court erred in special instructions given in answer to inquiries by the jury, that such error was prejudicial and that that defendant's conviction on Count III must be reversed. The other errors of which complaint has been made are either groundless or not prejudicial and the conviction on Count I should be affirmed.

I. No Prejudicial Error Was Committed In Overruling The Demurrer To Count I Of The Indictment.

 A. Defendant received adequate notice of the offense which he was charged with committing.

Defendant recognizes the provisions of section 960 of the Penal Code which provide: No accusatory pleading is insufficient, nor can the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form which does not prejudice a substantial right of the defendant upon the merits.'' He asserts that in this case, however, he was prejudiced because he could not know the nature or identity of the criminal offense with which he was charged. The questions of whether the allegations of Count I stated a public offense, and, if so, the nature of that offense impregnated the entire trial because they affected the decisions as to the admissibility of evidence offered by the prosecution against defendant, the theories on which the case was submit-

ted to the jury through the court's instructions, and the question of whether defendant has suffered either two convictions or double punishment for the same conduct.

In Count I it is alleged: "The Grand Jury of the County of Santa Clara, State of California, hereby accuses Maurice H. Hardeman and Kenneth G. Wickholm of a felony, to wit, a violation of Section 182.5 [*sic*] of the Penal Code of the State of California (Conspiracy to Pervert and Obstruct Justice), in that on or about and between October 7, A.D. 1961 and October 6, A.D. 1964, in the County of Santa Clara, State of California, they did wilfully and unlawfully conspire, combine, confederate and agree together to pervert and obstruct justice and the due administration of the laws." There follows a recital of 24 alleged overt acts of which 17 are attributed to defendant, 6 to Wickholm and one to them both jointly. Examination of the content of these allegations is deferred to a subsequent exploration of their effect on the sufficiency of the pleading.

That portion of section 182 of the Penal Code which is in question here reads as follows: "If two or more persons conspire: . . . 5. To commit any act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws. . . . They are punishable as follows: [There follows specific provisions for the punishment of conspiracy to commit (1) 'any crime against the person of any official specified in subdivision 6,' (2) 'any other felony,' (3) 'two or more felonies,'[2] (4) 'any of the other acts described in this section.']"

Attacks on the constitutionality of this subdivision of the section have been consistently overruled. (*Calhoun* v. *Superior Court* (1955) 46 Cal.2d 18, 31 [291 P.2d 474]; *Lorenson* v. *Superior Court* (1950) 35 Cal.2d 49, 59-61 [216 P.2d 859]; *Davis* v. *Superior Court* (1959) 175 Cal.App.2d 8, 13-17 [345 P.2d 513]; *People* v. *Sullivan* (1952) 113 Cal.App.2d 510, 519-521 [248 P.2d 520]; but cf. *Musser* v. *Utah* (1948) 333 U.S. 95, 96-97 [68 S.Ct. 397, 92 L.Ed. 562]; *State* v. *Musser* (1950) 118 Utah 537, 539 [223 P.2d 193, 194]; and *In re Newbern* (1960) 53 Cal.2d 786, 792 and 797 [3 Cal.Rptr. 364, 350 P.2d 116].)

In *Lorenson* the opinion concluded as follows: "Considering the well-settled meaning at common law of the words 'to

---

[2]By Stats. 1965, ch. 924, § 1, p. 2534, effective September 17, 1965, there was inserted in the section a further provision for the specific punishment of a conspiracy to commit "an act described in subdivision 4."

pervert or obstruct justice or the due administration of the laws,' the other and more specific provisions in the Penal Code concerning 'Crimes Against Public Justice,' and the relative certainty of words employed in statutes which have been held valid, it cannot be said that subsection 5 of section 182 of the Penal Code is unconstitutional.'' (35 Cal.2d at pp. 60-61.)

Defendant acknowledges that the statutory provisions have been so upheld, but asserts that it is nevertheless improper to charge him in the bare words of the statute because the provisions of the statute alone ''seem to be warrant for conviction for agreement to do almost any act which a judge and jury might find at the moment contrary to his or its notions of what was good for health, morals, . . . justice or order.'' (*Musser* v. *Utah, supra,* 333 U.S. at p. 97.) The indictment, he asserts, therefore, offends the requirement of the Sixth Amendment to the United States Constitution which recites: ''In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation, . . .'' In *United States* v. *Cruikshank* (1875) 92 U.S. 542 [23 L.Ed. 588], the opinion recites: ''The object of the indictment is, first, to furnish the accused with such a description of the charge against him as will enable him to make his defense, and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause; and, second, to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had. For this, facts are to be stated, not conclusions of law alone. A crime is made up of acts and intent; and these must be set forth in the indictment, with reasonable particularity of time, place and circumstances.'' (92 U.S. at p. 558.) The opinion further suggests that where conspiracy is charged ''it is necessary for the indictment to state the means proposed, in order that the court may see that they are in fact illegal'' (pp. 558-559). It points out that where conspiracy to commit a certain class of crime is an offense, ''The accused has . . . the right to have a specification of the charge against him in this respect, in order that he may decide whether he should present his defense by motion to quash, demurrer, or plea; and the court, that it may determine whether the facts will sustain the indictment'' (p. 559). In support of this contention, attention is directed to the reference in *Lorenson* to the fact that ''Crimes Against Public Justice'' are collected and set forth in Title VII (§§ 92-185) of Part I of the Penal Code. It is urged that the indictment to be valid must

set forth one or more of the offenses therein contained, in addition to the general charge, or else be void for uncertainty because it would leave the accused subject to defending himself from a conspiracy to commit any one or more of the numerous crimes designated in that title. Some support is given this view by the fact that in those cases in which subdivision 5 has been before the courts the allegations of the charge in the indictment generally have been accompanied by a reference to a specific act or acts which, as an object of the conspiracy, brought it within the general prohibition of the statute, to wit: "to use [an officeholder's] official position . . . for their private gain by collecting funds from licensees and applicants for licenses" and "to prepare . . . false . . . papers, records . . . for fraudulent and deceitful purposes upon trials, proceedings and inquiries authorized by law" (*Calhoun* v. *Superior Court, supra,* 46 Cal.2d at pp. 20 and 34); "namely, § 4200, et seq., Health and Safety Code, State of California" (*People* v. *Olson* (1965) 232 Cal.App.2d 480 at p. 488 [42 Cal.Rptr. 760]); "to commit a crime, to wit: Violation of section 4570 of the Penal Code . . ." (*Davis* v. *Superior Court, supra,* 175 Cal.App.2d at p. 13); "to use the official position of city manager . . . for an unlawful purpose . . ." (*People* v. *Sullivan, supra,* 113 Cal.App.2d at p. 513); "by presenting . . . a fraudulent, worthless and void bail bond" (*People* v. *Ambrose* (1916) 31 Cal.App. 460, 461 [160 P. 840]).

On the other hand it appears that *Musser* actually only reviewed that portion of a similar statute which recites: "To commit any act injurious . . . to public morals" (333 U.S. at p. 96; 118 Utah at p. 538 [223 P.2d at p. 194]). *Lorenson,* however, specifically refers to that portion of the statute relating to a conspiracy "to pervert or obstruct justice or due administration of the law." The reference to the specific crimes in Title VII of Part I of the Penal Code is only one of the three pilings of the dolphin of constitutionality to which the opinion moors the foregoing provisions. It also noted: "Such an offense was recognized at common law and generally punishable as a misdemeanor" (35 Cal.2d at p. 59), and "a statute is sufficiently certain if it employs words of long usage or with a common meaning 'notwithstanding an element of degree in the definition as to which estimates might differ.' [Citations.]" (P. 60.) After determining that the provisions of subdivision 5 are constitutional, the opinion unqualifiedly concludes: "For substantially the same reasons, the indict-

16

ment against Lorenson is not vague, indefinite, or uncertain and it complies with the statutory requirement for such an accusation. Section 952 of the Penal Code allows an indictment to be stated 'in the words of the enactment describing the offense or declaring the matter to be a public offense, or in any words sufficient to give the accused notice of the offense of which he is accused.' Lorenson was indicted in the terms of the 'enactment describing the offense,' and the grand jury has fairly informed him of the acts of which he is accused to the extent which will enable him to defend himself. (*People* v. *Emmons,* 13 Cal.App. 487, 492 [110 P. 151].)'' (P. 61.) Section 182 provides a specific punishment for a conspiracy to do an act described in the section which is neither encompassed within subdivision 5 [and now also subdivision 4] nor an independent felony. These provisions for punishment may well apply to the conduct proscribed by subdivisions 2, 3 and 5 as substantive crimes in and of themselves, as well as to a conspiracy under subdivision 1 to commit a misdemeanor. If so, the provisions of section 952 should govern as so indicated by *Lorenson.*

In *Davis* v. *Superior Court, supra,* this court in reviewing *Musser, Lorenson, Sullivan* and *Calhoun* states: ''The constitutionality of the California statute, however, rests upon the fact that three cases have charted boundaries to its otherwise limitless sea of criminality.'' (175 Cal.App.2d at p. 14.) In analyzing *Lorenson* it states: ''The reference to 'Crimes Against Public Justice' does not necessarily exclude a crime not defined within the four corners of that part I, title VII, of the Penal Code, such as section 4570, involved in this indictment. The court's reference to such crimes was illustrative, rather than exclusionary; the type of conduct with which title VII principally deals falls within the category of acts 'to pervert or obstruct justice.' '' (*Id.,* p. 16.) Despite this extension of subdivision 5 beyond the limited scope to which defendant would relate it, the final conclusion of the court— ''Hence, as interpreted by the California cases, section 182, subdivision 5, is not limitless but contracted'' (*id.,* p. 16)— does suggest that in each case it should be made specific by reference to the particular objective which is relied upon as falling within the general prohibition of the statute.

If it be assumed that it would be better practice to state the specific object or objects to which the conspirators were accused of having agreed to attain to pervert and obstruct justice and the due administration of the laws, the question

remains whether the failure to so allege, and the overruling of the demurrer constituted prejudicial error.

Defendant claims he was forced to speculate which of any of the numerous crimes set forth in Title VII of Part I of the Penal Code he was accused of conspiring to violate. He points to the record which discloses a persistent equivocation on the part of the prosecution as to just what was the object of the conspiracy referred to in Count I. At one point it was asserted that it was a conspiracy which began before the fire and continued thereafter with the object of concealing that the offense of arson had been committed. In the final summation it was asserted that it had nothing to do with the arson referred to in Counts II and III. It was also alluded to as a conspiracy involving the withholding or the giving of false information to police officers, or for the preparation of false written evidence. In their brief the People indiscriminately refer to a conspiracy to conceal the original arson, a conspiracy to collect insurance proceeds, a conspiracy to conceal Wickholm's subsequent theft of a compressor, and a conspiracy to conceal both the theft and the arson.

In instructing the jury the court mentioned the constitutional restraint on the practice of law by a municipal judge (art. VI, §§ 12 and 18), and the disqualification of a judge in regard to matters involving a former client. (Code Civ. Proc., § 170.4.) It advised the jurors that fixing bail, authorizing release on bail and authorizing search warrants are actions involving judicial discretion. Malfeasance and nonfeasance were defined; and the elements of Count I were more specifically referred to as follows: ''Any conspiracy to do any of the following mentioned acts would constitute a conspiracy to pervert and obstruct justice and the due administration of the law: To unlawfully hinder, delay or obstruct any police officer in the discharge or attempt to discharge his official duty to investigate the commission of a public offense: To attempt by any fraudulent means to induce any person to give false testimony or withhold true testimony: To unlawfully induce a person to withhold information from or to give false information to police officers investigating the commission of a public offense: To attempt to manufacture false evidence to be produced for investigating police officers or to be produced at a trial: To prepare any false or ante-dated paper, record, instrument in writing, or other matter or thing with intent to produce it, or allow it to be produced for any fraudulent or deceitful purpose as genuine or true upon any trial, proceed-

ing, or inquiry whatever, authorized by law; To effect malfeasance and nonfeasance by a Judge in connection with the administration of his public duties.''

A reexamination of the indictment and the specific 18 alleged overt acts in which it is alleged defendant participated reflects that these allegations gave defendant notice that he would be called upon to meet the charges which are found in the prosecution's arguments and which are alluded to in the court's instructions. Acts 3 to 6, inclusive, allege that defendant and Wickholm discussed the fire after it occurred on November 28, 1963, that Wickholm prepared bids for rebuilding, that defendant submitted them to the insurance company and received its check for $2,000. It having been previously alleged that Wickholm set the fire, it reasonably may be inferred that these allegations, as do similar allegations in respect of the six overt acts alleged in Count III, refer to the conspiracy to commit arson, or that they may relate to a conspiracy to burn property to defraud an insurer. (See Pen. Code, § 548.) The allegations continue, however, and refer to a meeting between the conspirators the following September 1964. They specifically charge that the defendant instructed a woman, with a name similar to that of a witness before the grand jury, not to talk; that defendant instructed Wickholm to obtain a receipt for a stolen compressor; that defendant discussed the stolen compressor once with Officer Pirtle and again with another officer; that defendant refused to issue a search warrant against Wickholm; that he attempted to phone Wickholm; that he had an early morning conversation with the woman referred to above and attempted to convince her not to talk about a stolen compressor, or property which defendant had received from Wickholm, or the burning of defendant's dwelling by Wickholm for insurance purposes; that defendant drove to Wickholm's residence early the same morning; that he talked on the telephone with Wickholm who was jailed and arranged for his release on bail; and that in the forepart of that September defendant received personal property from Wickholm.

Defendant was furnished a copy of the transcript of the testimony before the grand jury. Although, as hereinafter noted, it was not made a part of the record on appeal, the references to it in defendant's brief reveal that the testimony taken there encompassed all of the matters which the prosecution referred to in argument, and those which are embraced in the court's instructions. Under such circumstances, it cannot

be said that defendant was prejudiced because of the error, if any, in failing to more specifically designate the object of the conspiracy in the indictment. (Pen. Code, § 960; and see: *People* v. *Bishop* (1963) 220 Cal.App.2d 148, 149-150 [33 Cal.Rptr. 658]; *People* v. *Chapman* (1962) 207 Cal.App.2d 557, 570 [24 Cal.Rptr. 568]; *People* v. *Lamb* (1962) 204 Cal.App.2d 255, 262-263 [22 Cal.Rptr. 284]; *People* v. *Mason* (1960) 184 Cal.App.2d 317, 353-356 [7 Cal.Rptr. 627]; *People* v. *Docherty* (1960) 178 Cal.App.2d 33, 38-39 [2 Cal.Rptr. 722]; *People* v. *Gordon* (1945) 71 Cal.App.2d 606, 610-612 [163 P.2d 110].) ▪ The principle that ''The purpose of the overt act is simply to show that the agreement has proceeded beyond the meeting of the minds stage to some direct or physical act, however innocent in itself, tending toward the furtherance of the objective of the conspiracy'' (*People* v. *Saugstad* (1962) 203 Cal.App.2d 536, 549-550 [21 Cal.Rptr. 740]; and see: *Yates* v. *United States* (1957) 354 U.S. 298, 334 [77 S.Ct. 1064, 1 L.Ed.2d 1356]), does not preclude consideration of the alleged overt acts as a portion of the pleading which gives the defendant notice of the issues he must face. ''Thus the allegations of all of the paragraphs of an information charging conspiracy must be construed together, . . .'' (*People* v. *Bishop, supra,* 220 Cal.App.2d at p. 150.)

▪ Defendant was not called upon to meet any issues of which he did not have notice. The gravamen of his complaint of uncertainty resolves itself into a complaint that the conspiracy to pervert and obstruct justice and the due administration of the laws should be limited to one specific other substantive offense. It need not be so limited because it may well involve a course of conduct which involves several substantive offenses together with conduct which except for the prohibited objective is perfectly legal. (Cf. *People* v. *Barnard* (1923) 63 Cal.App. 562, 571-572 [219 P. 756] with *People* v. *Bennett* (1955) 132 Cal.App.2d 569, 578 [282 P.2d 590]; *People* v. *Hess* (1951) 104 Cal.App.2d 642, 671 [234 P.2d 65]; and *People* v. *Yant* (1938) 26 Cal.App.2d 725, 729-730 [80 P.2d 506].)

▪ B. There was no prejudicial ambiguity in the allegations of Count I.

Defendant further asserts that the allegations of Count I, insofar as they allege a conspiracy to conceal the commission of the offense of arson, do not state a public offense, other and different from the conspiracy to commit the substantive offense of arson itself. ▪ Generally the conspiracy comes to an

end with the performance, or failure to effect the contemplated act, and the concealment is a mere incident thereof which is not a new conspiracy so as to toll the running of the statute of limitations, or permit the post-offense declarations of one conspirator to be used against another. (*Grunewald* v. *United States* (1957) 353 U.S. 391, 401-405 [77 S.Ct. 963, 1 L.Ed.2d 931, 62 A.L.R.2d 1344]; *Lutwak* v. *United States* (1953) 344 U.S. 604, 616-618 [73 S.Ct. 481, 97 L.Ed. 593]; *Krulewitch* v. *United States* (1949) 336 U.S. 440, 443-444 [69 S.Ct. 716, 93 L.Ed. 790]; *People* v. *Crosby* (1962) 58 Cal.2d 713, 728 [25 Cal.Rptr. 847, 375 P.2d 839]; *People* v. *Olson, supra,* 232 Cal.App.2d 480, 491.) ▮ The foregoing authorities appear to bar consideration of the first count as a conspiracy entered into prior to the fire to pervert and obstruct justice and the due administration of the laws by concealing the fact that arson was committed.

In *Krulewitch* only the conspiracy to commit the substantive offenses was involved. (336 U.S. at p. 441.) In *Lutwak* a count alleging conspiracy to conceal the conspiracy to commit and the commission of the substantive offense was contained in the indictment. (344 U.S. at p. 617.) The court found, however, that there was no proof of such a conspiracy as distinguished from the original agreement and that therefore declarations made by one conspirator after the commission of the offense were improperly, although not prejudicially, admitted against another. (Pp. 617-620.) *Grunewald* recognizes that there may be a conspiracy to effect concealment until the period in which prosecution or imposition of penalties has run. (353 U.S. at pp. 407-411.)

So here the People contend that Count I is more than a mere conspiracy to conceal the arson. It is stated that although defendant was motivated to intercede into the compressor matter in order to keep Wickholm from talking about the arson, there was a new and separate object in that defendant conspired with Wickholm to pervert and obstruct justice and the due administration of the laws to prevent the latter from being prosecuted for the theft of the compressor. The shift in emphasis demonstrates the shortcomings of permitting the indictment to stand in the statutory language without amplification. Here again, however, any possible error must be viewed to determine its prejudicial effect. Reference to the overt acts charged and the admitted contents of the transcript of proceedings reflects that the defendant was adequately notified that he would have to meet issues arising at or about the time

that Wickholm allegedly took a compressor and subsequent thereto.

It is concluded that the error, if any, in overruling the demurrer to Count I was not prejudicial. The question of the effect of the phraseology in which the indictment was couched upon the admission of evidence and the instructions of the court is hereafter considered.

II. THE RULING ON DEFENDANT'S MOTION TO SET ASIDE THE INDICTMENT CANNOT BE REVIEWED IN THESE PROCEED-INGS.

The designation of the record on appeal contained in defendant's notice of appeal fails to include a request for or designation of the transcript of the proceedings before the grand jury which led to his indictment. Under these circumstances the court cannot consider whether the trial court erred in denying defendant's motion to set aside the indictment under the provisions of section 995 of the Penal Code. (*People* v. *Scott* (1944) 24 Cal.2d 774, 777 [151 P.2d 517]; *People* v. *Jones* (1964) 228 Cal.App.2d 74, 90 [39 Cal.Rptr. 302].) Parenthetically it is noted that the record before the grand jury was enhanced by the testimony of the woman who subsequently became Wickholm's wife. If the evidence at the trial, without her testimony, is sufficient to support the judgment, the probabilities lie with the assumption that the record before the grand jury had even more probative force. Defendant has so stated in his opening brief.

III. THE COMPETENCY AND SUFFICIENCY OF THE EVIDENCE.

In order to determine the question of the sufficiency of the evidence it must be determined what evidence was actually before the jury, and the propriety of its admission. The facts as adduced, the manner in which the jury was instructed to consider them, and the sufficiency of the evidence as so screened by the court are discussed in that order.

A. The facts as established by the evidence.

In 1960 defendant, who was then a practicing lawyer in San Jose, purchased a ranch in southern Santa Clara County, west of Gilroy, off the Hecker Pass Road to Watsonville. The improvements consisted of a main house and several outbuildings including a cabin which he had intended to remodel or replace. The walls and siding were in good shape, but the roof and floor had deteriorated. On the basis of its square footage it was estimated to have had replacement value of $4,000 at

the time it was burned. The ranch was encumbered by a first mortgage to a bank with a balance in the approximate sum of $13,000 or $14,000 and with a second mortgage of $19,000 or $20,000 to a title company.

Codefendant Wickholm in 1962 secured defendant's services to defend him in an action in which one Stella Caine was seeking to cancel some allegedly forged notes and a deed of trust covering her property. According to Hardeman he had rendered services of a value of $500 in this case and had only received $100 payment on account, but he had not billed Wickholm for the balance. Defendant also undertook to represent Wickholm in a companion suit in which he sought to recover from a purchaser of the same notes who had stopped payment on the check which he had given for the purchase price. This suit was taken on a contingent basis and was turned over to defendant's successor in practice in 1964 when he went on the bench. There was nothing due although defendant had rendered services he estimates to be of a value of $200.

In January 1963 defendant filed a divorce action for Wickholm's wife and in August 1963 an interlocutory decree was secured. Wickholm had agreed to pay the fee, set at $300, but payment was offset by a pony which Wickholm gave defendant for his daughter. About the same time as the divorce was obtained, defendant intervened on Wickholm's behalf by telephoning the district attorney in reference to an incident in which Wickholm settled an accusation of stealing grain, by doing some painting for the feed merchant who so accused him. No charge was made for this service.

Meanwhile, Wickholm had purported to go through a marriage ceremony with one Nadine Patrick who had been the corroborating witness at the recent divorce. On November 21, 1963, defendant filed an annulment suit in another county. Three hundred twenty-five dollars was to be due when the judgment was secured, but it was to be offset against Wickholm's services in painting the ranch buildings.

Defendant conceded that in November 1963 there were fees owed to him by Wickholm, and that Wickholm was a hard man from whom to collect. In addition to the goods and service referred to above it was shown that the painting continued during the winter of 1963-1964; that in the summer of 1964 Wickholm delivered some fence posts and dug some post holes for defendant; and that in the fall he gave defendant some deer meat.

Wickholm did painting at defendant's ranch during the latter part of October and in November. ■■■■ Witness Mary O'Brien, a friend of Nadine Patrick with whom Wickholm had then established residence, testified that during this period on an occasion she was visiting Nadine, Sherman drove in on the painting truck with Wickholm some time before noon. [Wickholm said they could not do the job because he had missed someone; and they both said that on their way back from Santa Cruz they helped pull a man out of a ditch.],[3,4] Wickholm went to the telephone to make a call. [Nadine asked Wickholm, "Why bug him?" Wickholm said, "I want to get this . . . job over with, I want it done now, I want it straightened up."][4] Wickholm began to make the call. [Sherman remarked, "Why bother to paint this barn when its going to be burned down?" Wickholm told Sherman to shut up and told Nadine in an angry and vulgar manner to get herself and the witness out of the kitchen.][5] Before leaving the witness heard Wickholm address someone over the phone as "Dolly" and then heard him say, "Hello Maury." She had heard him make similar telephone calls before.

According to witness Dorothy Syzemore: Sherman stated in early November 1963 that he and Wickholm were going to build a cabin in the Morgan Hill or Gilroy area for a lawyer in order to pay the fee for Nadine's annulment. [Objection to this testimony was overruled.]

During the period now under review defendant Sherman was living with one Delores Elderton. She knew Wickholm, and Sherman and Wickholm had borrowed her car on occasion. On November 28, 1963, Thanksgiving day, after having dinner with friends and the latter's relatives, Sherman and Delores and others at about 6 o'clock in the evening went to the Red Barn bar which is situated south of San Jose, and about 29 miles from the Hardeman ranch. (Although it is impossible to reconcile the testimony of all of the witnesses as to just who was present at the bar on that evening, and the times involved in the respective arrivals and departures, the jury was entitled to and apparently did accept the testimony of Delores.)

[3]In order to preserve continuity of the action, and yet at the same time distinguish the declarations which were received against any of the defendants from the evidence which was unqualifiedly admitted as to the appealing defendant, the former are placed in brackets.

[4]Declarations so designated by "4" were admitted only as against the defendants Wickholm and Sherman.

[5]Declarations designated by "5" were admitted only as against the alleged utterer.

[According to Delores, Sherman told her that he and "Ken" were going to burn down a cabin. When "Ken" (Wickholm) came in Sherman requested the keys to Delores' car.][5] She gave him the keys and the two men left about an hour and three quarters after Delores had arrived.

At 8:28 p.m. the Gilroy Fire Department received a report of a fire at the Hardeman ranch. The fire fighting equipment arrived at the scene at 9:03 p.m. but was unable to quell the blaze before the roof and most of the walls were destroyed. Hardeman first learned of the fire from a neighbor. He drove down to the scene and arrived about 11 p.m. The next day a deputy county fire marshal contacted Hardeman who told him that he had had prior trouble with the wiring which passed by a pole by the cabin, and that the investigator should not unnecessarily stir up trouble with the neighbors about the children running around because Hardeman was trying to settle some of the disputes the neighbors then had among themselves. The cause of the fire was listed as "undetermined."

Some two hours after he had left the bar, or shortly before 11 p.m., Wickholm returned to the Red Barn. At his request, Delores and others left, joined Sherman at the car, repaired to another bar and finally went home for the night.

[The next morning at Delores' home she observed Wickholm turn to Sherman after making a phone call and heard Wickholm state: "Maury says for once we've done something right. It's the first right thing we've done"; and that "Maury" was very surprised when he got the call about his cabin.][4] [Later that day Sherman stated: That he and Wickholm had burned the cabin to reduce or square the bill which Wickholm owed Hardeman; and that they had started the fire in an old bureau drawer with paint thinner, rags and paper.][5]

Delores told Nadine about the fire three or four days later, [and the next day Wickholm telephoned her and stated that he was angry because a third party had told him that Delores had made these statements to Nadine, that Sherman should not have told her, and that she must be quiet.][5]

About a week after the fire Sherman, Wickholm, Delores and Nadine drove out to the scene of the burned cabin in Delores' car. [While out of the car and looking at the ruins, and with Wickholm in the vicinity, Sherman stated: "That's where we started the fire."][4]

[4,5]See page 23 for footnote.

Meanwhile, on December 2d Hardeman reported the loss to his insurance agent. Thereafter Hardeman received a telephone call from an insurance adjustor and was told to get some bids for the cost of rebuilding the cabin. On January 2, 1964, defendant turned over three bids and some plans to the adjustor and received a check for $2,000, the maximum amount payable on accessory buildings. Neither Hardeman nor the agent or the adjustor gave any notice to the first or second lien holder. The check which was payable to defendant and his wife was subsequently deposited in a joint account which Hardeman maintained with his sister. Shortly thereafter a new bank book, which merely reflected the balance and not the deposit, was issued to Hardeman who allegedly had lost the original.

The bids which Hardeman turned over to the adjustor were from Vernon Roman, Mayfair Development Company, and KGW Construction Company. The last named was from Wickholm himself; [the first had been secured and prepared by Wickholm by obtaining the signature of Roman to a blank piece of paper on the representation he was going to use it for a letter of recommendation] ;[5] [and the third had been secured from one Gonzales, who was using Wickholm as the "responsible managing employee" for Mayfair's contracting license, and who had his foreman sign the bid.][5]

On December 29, 1963, Hardeman obtained the annulment for Wickholm. About that time Sherman told witness Syzemore that the cabin had been built and "Nadine got what she wanted." [Objection to this testimony was overruled.]

[In January 1964 Delores told Sherman in the presence of Wickholm that if he did not repay her some money he had borrowed she would tell the authorities about the fire. Sherman told her that if she did she would "swing right alongside of he and Ken." Sherman was angry and was calmed down by Wickholm.][4]

On February 10, 1964, Hardeman took office as a judge of the municipal court.

On June 15, 1964, Wickholm borrowed a pickup truck from Thurman Wariner, the foreman of the O'Connell ranch. He took the truck from the Red Barn and was gone about 45 minutes. [On his return he instructed Wariner and his brother that if anyone asked whether the pickup had been moved to say no.][5]

[5]See page 23 for footnote.

On June 16, 1964, the theft of a mobile compressor belonging to the Bridges Construction Company from a job site about a half a mile from the Red Barn was reported to the sheriff's office. On September 4, 1964, Wariner mentioned some rumors he had heard about Wickholm using his truck to a member of the sheriff's office with whom he was hunting. A detective from the sheriff's office interviewed Wariner. The defendant brought out that Wariner and one Moss divulged that Wickholm was the person responsible for the theft of the compressor, and that he had probably taken it to the vicinity of Redding in Northern California. At the time Wickholm and a Mrs. Ferris were living together on the O'Connell ranch.

On September 9th, Admission Day, the defendant left his chambers and met Wickholm and Mrs. Ferris for lunch. According to the defendant this meeting was at the request of Wickholm who told him that he had taken a compressor and that it was merely a matter of time until a pending investigation would catch up with him. The defendant told Wickholm to go and get the compressor and leave it behind his old office, to make his peace with the sheriff, and get himself an attorney. In response to Wickholm's suggestion that he had or could get a receipt, the defendant told him that he could not rely on it as a defense. Hardeman denied that Wickholm told him he had or was going to get a forged receipt, or that he told Wickholm to get a forged receipt.

The next day, September 10th, defendant called the sheriff's office and asked a lieutenant in the sheriff's office if they were investigating the theft of a compressor. He revealed that Wickholm, a former client, knew that the sheriff's office was looking for him, that Wickholm's wife had contacted him, and that the suspect was in Oregon trying to recover the compressor and if he had time could recover it over the weekend. The lieutenant advised defendant he would check and call him back. He left a note for the investigating detective to call defendant. Later the detective to whom the investigation was assigned phoned defendant and was given the same information.

Meanwhile, Wickholm had gone to Redding and met one Pires, the purchaser of the compressor. [He advised him that it was stolen and that if it were not returned he would be in trouble.][5] Pires would not part with the compressor unless compensated. Wickholm telephoned Hardeman, and had Hardeman talk to Pires on two occasions during the night.

[5]See page 23 for footnote.

Pires instigated a check through the local sheriff's office which was unproductive, but the compressor was ultimately released in exchange for $750 in cash and the check of one Hoover for $350 on which payment was subsequently stopped.

Some evening after September 8, 1964, on which day he was hospitalized, one McGuire an old acquaintance of Wickholm, at the latter's request wrote the signature "Albert Maddox" on a blank piece of paper, and his own signature on one or two other pieces of paper. Wickholm said he wanted the signatures to use for testimony of the quality of his work. [Defendant's objection to the admission of this statement was overruled.] The first paper as filled out in Wickholm's handwriting acknowledged the receipt from Wickholm of $450 for a compressor and a paint pot on June 13, 1964.

On September 11th the detective from the sheriff's office returned to the O'Connell ranch and talked to Wariner and Mrs. Ferris whom the Wariners had requested to talk to the authorities. He received three phone calls from the latter that night, and at 2:30 a.m. on the 12th arrested Wickholm as he drove up to the parking lot where Hardeman had told him to return the compressor. [Wickholm stated that he had purchased the compressor from a man named Albert Maddox, but that he had been unable to locate him.][5] Wickholm was booked at the jail at 4 a.m. and phoned defendant at 4:56 a.m. At 5:30 a.m. a release signed by defendant was issued, and at 7 a.m. Wickholm was released from jail when a bondsman, whom defendant had called, posted bail.

Mrs. Ferris telephoned the detective on September 15th, September 16th, and once again before the 19th, on which day she met with the detective and a sergeant from the sheriff's office. She gave written statements on the 11th and 19th.

Defendant testified that he saw Wickholm in the municipal court building on September 24, 1964, the day on which he was to be arraigned for theft of the compressor, at about 1 p.m., that Wickholm told him that Mrs. Ferris was telling anyone who would listen to her about alleged offenses of Wickholm, and that Wickholm had given Hardeman property which the donor knew was stolen. Wickholm denied the property was stolen and Hardeman said that she had better shut up or get herself a lawyer.

About 9 p.m. on September 24th information was received that Wickholm had a forged receipt in his possession. An affidavit was prepared for the issuance of a search warrant,

[5]See page 23 for footnote.

and shortly after midnight the affidavit was presented to a superior court judge and a bench warrant was issued. Duplicate forms of affidavit and search warrant were prepared. Armed with these papers the sheriff's detective, the district attorney's investigator, and two uniformed deputies went in three cars to the house occupied by Wickholm, Ruth Ferris, and the latter's three children, on the O'Connell ranch. The defendant on cross-examination introduced the affidavit for the search warrant which reflected that it was predicated upon information received from a reliable confidential informant who would be in danger if the name were revealed. He brought out that the officers first searched the premises rather than Wickholm's person to divert suspicion from Mrs. Ferris who had furnished the information that Wickholm was carrying a receipt he had secured from McGuire. The forged receipt was found in Wickholm's wallet and he was placed under arrest at about 2:30 a.m. [Wickholm when first interrogated that morning had admitted that he had two receipts, denied he had either with him, and stated that one or both were in the office of the attorney who had taken over the defendant's former law office.][5] Wickholm was turned over to the uniformed deputies at about 3 or 3:15 a.m. under instructions to head back toward the jail but not to take him there until they heard from the investigator and the detective. He was not booked until 5:25 a.m.

The sheriff's detective proceeded to Hardeman's home and left the investigator, Mrs. Ferris and the children at the ranch. After being ushered into the house by Mrs. Hardeman, he presented the affidavit and the proposed search warrant, which did not have a provision for service in the nighttime, to defendant. Defendant stated that he had helped this man enough and that he wouldn't sign it. According to the detective, Hardeman remarked on the fact that Wickholm had been arrested, although he had told the detective that Wickholm would surrender himself, and Hardeman then instructed him to go to another judge. This confrontation was admittedly designed to determine whether Hardeman would attempt to communicate with Wickholm. At the trial defendant testified that in addition to his expressed reason for declining to sign the warrant, which was predicated upon his possible disqualification, he realized at the time that he had become very much a part of the particular matter in which he was asked to issue the search warrant because of his prior representations to the

[5]See page 23 for footnote.

sheriff's office and advice to Wickholm, and that he was concerned because the detective who presented the warrant had reportedly expressed some concern and animosity about the defendant's interference in the matter, and because the officer could have presented the warrant to any one of 24 other judges. When first interrogated at the district attorney's office on October 5, 1964, he stated that ''It just didn't ring clear to me as to what they wanted a search warrant for a receipt''; and ''I knew no reason for a search warrant because I understood the compressor had been returned'' as the reasons for his refusal to issue the search warrant. He then stated that he had told the detective, ''This is getting sticky . . . I would prefer that you—you get another judge to—sign the search warrant . . .'' Before the grand jury he stated, ''I guess now that I reflect about it. I became puzzled as to why he [the detective] would object [to defendant's interference in the investigation] in one instance and now he has a search warrant regarding a receipt, and I guess I became aware then that I was getting a little involved.''

According to defendant, he then started to phone the presiding judge of the municipal court, thought better of it because of the early morning hour, and then unsuccessfully attempted to get Wickholm's telephone number by a call he was unable to complete to the attorney who had succeeded to his practice and by a call to the information operator. In his original voluntary statement to the district attorney he stated that he went to bed, that he did not attempt any phone calls and only got up to answer Mrs. Ferris' call. Before the grand jury and at the trial he related the foregoing efforts to communicate with Wickholm. Defendant first said before the grand jury that he wanted to talk to Wickholm to find out about the receipt, that he was puzzled why Wickholm would be concerned with a receipt after he had brought the compressor back. At the trial defendant stated that he did not intend to mention anything to Wickholm about a forged receipt over the telephone, but merely that it was important that he see him right away; that he wanted to get Wickholm to give him the receipt and take Wickholm and the receipt to the sheriff's office.

Meanwhile, the district attorney's investigator with Mrs. Ferris' consent had attached an eavesdropping and recording device to the telephone. At 3:05 a.m. he advised by radio that this had been accomplished. Subsequently at 3:58 a.m. a telephone call was made to defendant's house and the conversation between defendant and Mrs. Ferris was re-

corded. On *voir dire,* but not before the jury, it was brought out that the investigator told Mrs. Ferris what the conversation should evolve around basically—the subjects which she had told the authorities Wickholm and Hardeman were involved in—and that he passed her notes suggesting questions during the conversation.

Mrs. Ferris identified herself and defendant immediately asked: "The Sheriff's been out there?" After receiving an affirmative reply and advice that the house had been searched and that Wickholm had been arrested and taken down town, the defendant volunteered: "He [the detective] came here about 4:30 what, with a—wanting to get a search warrant, and I couldn't find your phone number." Discussion as to the manner in which the phone was listed terminated in defendant's observation: "That's where we erred, because we tried in—"; and was immediately followed by the inquiry, "did they find the receipt?" Mrs. Ferris replied in the affirmative and in response to defendant's inquiry as to who had told the authorities about the receipt admitted that she had. Defendant then indicated that he had advised her that she didn't know anything about it, and that she should not say anything.[6] This same advice was referred to or given at several other points in the conversation.[7] Defendant while deprecating the importance of the receipt disclosed that he had knowledge of the existence of the receipt prior to seeing the affidavit for the

---

[6] "JUDGE HARDEMAN: Well, who told them about the receipt? RUTH FERRIS: I told them that he had a receipt. I didn't tell 'em anything—— JUDGE HARDEMAN: Yeah, but you—yes, but you see, this is what I told you when you first in there, you didn't know anything about it. RUTH FERRIS: I know you told me not to say anything. JUDGE HARDEMAN: And you see—but somebody gives you some advice, you don't follow it, you see what happens? RUTH FERRIS: I'm sorry, Judge, but I just can't lie that easy. When people start asking me questions, I get scared. JUDGE HARDEMAN: All right, and this is what happens, you see."

[7] "JUDGE HARDEMAN: Well, you brought this on yourself, you brought this on yourself, because I told you that—that the only thing was you didn't know anything about it, because the more you start explaining the more you going to have to explain and this is what you have to do. RUTH FERRIS: I know. I am sorry. JUDGE HARDEMAN: I—I can't—I get the word to you and I can't—you expose us. I told Ken this morning, I said, 'The more she talks the more she's exposing, and all of it is going to come down around your neck' because you can't represent yourself in a thing like this and you can't cope with them when they're asking you things."

. . . . . . . . . . .

"RUTH FERRIS: Well, listen, I'm scared to death. JUDGE HARDEMAN: Well, you should have been scared in the beginning not to tell 'em anything."

. . . . . . . . . . .

search warrant, and that he knew it was supposed to be given
to the attorney for Wickholm.[8] He, however, denied an accusa-
tion that he had told Wickholm to get a false receipt.[9] Mrs.
Ferris persisted in implying that matters other than the com-
pressor were involved, and defendant after first advising her
that she had a right not to talk, then suggested she tell his
successor attorney, and when confronted with the statement
that Wickholm had taken things and given them to defendant

---

"RUTH FERRIS: . . . Now they're going to take me in, too; they're going to send somebody out pretty soon to take care of the kids and take me in and question me some more. JUDGE HARDEMAN: As I told—well, as I—it's up to you whether you want to talk or not. They've got to give you—if they don't allow you to have an attorney present, then they can get a writ of habeas corpus, you see. I told Ken to tell you when they wanted to take you in to get an attorney. Did you get that message?"

. . . . . . . . . . . .

"RUTH FERRIS: Well, I'm sorry. I didn't ask to get mixed up in all this. JUDGE HARDEMAN: I know you didn't. This is why I said, you know, in the beginning, I said, when, you remember, you started, when we had dinner that time, and I told Ken to get the compressor back——"

. . . . . . . . . . . .

"RUTH FERRIS: Well, I'm afraid they're going to ask me things like—these things that Ken stole and gave to you and stuff like this. JUDGE HARDEMAN: Why is it that you keep trying to tell me that you got—well, did you have to—— RUTH FERRIS: Well, I don't know. They've—they've asked so many questions, I don't know what—— JUDGE HARDE-MAN: Then why don't you say 'I don't know'? Have you ever heard of that word? RUTH FERRIS: Yes, I have. JUDGE HARDEMAN: Well, why don't you start using it? RUTH FERRIS: I don't know. I just get—— JUDGE HARDEMAN: Well, why don't you do it? RUTH FERRIS: I don't know. You know that—— JUDGE HARDEMAN: Well, why don't you do what I tell you? RUTH FERRIS: Well, you're asking me to lie, Judge Hardeman. JUDGE HARDEMAN: I am saying that—— RUTH FERRIS: As I said before in that, then I'd really get tangled up. JUDGE HARDEMAN: Well, just—if you just say that you don't know, that gets you tangled up? RUTH FERRIS: I guess not. I don't know."

[8]"RUTH FERRIS: I was worried about that receipt. When you told him to get that receipt I was afraid that something would happen. JUDGE HARDEMAN: But I thought sure he would get that to Miss Days, you see. RUTH FERRIS: Well, I didn't know where it was or anything about it; as a matter of fact, I thought—— JUDGE HARDEMAN: I didn't either; he said he had it, but I didn't think he had it on him. RUTH FERRIS: He said that you told him that he might need a different receipt or some-thing. JUDGE HARDEMAN: No, I told him, and I didn't even tell him to worry about a receipt because I knew the main idea is to get the thing back, you see. The receipt wasn't that im—the receipt, they aren't that important, really."

. . . . . . . . . . . .

[9]"RUTH FERRIS: Won't there be trouble if they found out that you told him to get this false receipt or something? JUDGE HARDEMAN: I didn't tell him to get any false receipt. He told me he had a receipt. RUTH FERRIS: I understood you told him to get it. JUDGE HARDEMAN: Well, I know, but I didn't say a thing—I didn't—I didn't say a thing. Now you—you are repeating something what you understood, and you just—what you're doing, you're just compounding what's already——"

finally requested that she drive over to his house.[10] Mrs. Ferris declined because she did not want to arouse her three children, and in response to defendant's inquiry advised him that the call was made on Wickholm's instructions. There was an interruption while defendant went from his upstairs to his downstairs phone and then interjected a conjecture as to whether the line was tapped and the comment that she was "a very dangerous person now."[11] After discussing any possible threat to Mrs. Ferris' custody of her children and her feeling that she did not need a lawyer because she had not done anything wrong, defendant observed that he had told Wickholm that they would not have been asking Mrs. Ferris so many questions if they had a case against him. Mention of Wickholm's propensity for getting into trouble led to the following colloquy: "RUTH FERRIS: I'm afraid that you're going to get involved; what will it do to you? JUDGE HARDEMAN: Well, but sure, sure, but the thing about is by your doing this you just exposing—you're getting Ken down in deeper, and you're pulling everybody else involved along with it. Is this necessary? RUTH FERRIS: Well, that's why I'm talking to you. I don't know. JUDGE HARDEMAN: Well, this is what I'm trying to tell you. There's no point in getting everybody involved in this thing. RUTH FERRIS: Well, I don't mean to get you involved, Judge. JUDGE HARDEMAN: But the intent—unintentional can be just as fatal as the intentional." A mention of

---

[10]"RUTH FERRIS: Well—well, it seems to me that there is something bigger in this than just this compressor. Now, Ken has told me a lot of things that—that I wished I didn't even know."

. . . . . . . . .

"RUTH FERRIS: . . . now Ken's told me things about you and about him that I'm scared. What if they start asking questions again? He told me that, that he had—— JUDGE HARDEMAN: Well, now, don't just—just keep, now, you see, there you go. Oh, gracious. You get hold of Miss Days and tell her. RUTH FERRIS: Well, I'm—I'm afraid of what they might ask me. They—Ken told me some awful things about you and him, Judge Hardeman. JUDGE HARDEMAN: What? RUTH FERRIS: He told me that he had taken things and given them to you. JUDGE HARDEMAN: Why are you, why are you—why are you just insisting on repeating this? RUTH FERRIS: Well, because I don't know what to do. I don't want to get anyone else involved in this. JUDGE HARDEMAN: Well, why don't you keep still? RUTH FERRIS: Well, when they come out here, they're—they're policemen. JUDGE HARDEMAN: Well, but—do you have a car now? RUTH FERRIS: Yes, I have a car. JUDGE HARDEMAN: Drive—Drive on down here to my place, will you?"

[11]"JUDGE HARDEMAN: . . . you're babbling like a brook. You don't know who's on the other end of the telephone. You don't know whether your line's tapped or not. RUTH FERRIS: No, I don't know any of these things. JUDGE HARDEMAN: Well, you see—huh? RUTH FERRIS: I don't know any of these things. JUDGE HARDEMAN: Well, you see, but you just—you're a very dangerous person now."

the horses, a saw, paint and ladders and the implication that they were stolen and that defendant was aware of their source drew a statement that he was ignorant of where Wickholm had acquired the articles.

The fire was mentioned as follows: "RUTH FERRIS: . . . Ken even told me one time that—that he burned a house down. JUDGE HARDEMAN: Now, now, now—now there you go. Can you shut your mouth, woman? Can you keep still? RUTH FERRIS: Well, I'm sorry— JUDGE HARDEMAN: Can you? RUTH FERRIS: —but these things are—this is something big, Judge Hardeman. This—this stolen compressor is one thing, but—but burning down a house to collect the insurance is another. JUDGE HARDEMAN: Now— RUTH FERRIS: I have heard of this sort of thing. JUDGE HARDEMAN: Are you happy now that you got that out? You just couldn't — you couldn't — you just couldn't resist telling that, could you? RUTH FERRIS: Well, I've been sick ever since he told me this. This is something big. Now, this, to me, sounds like something worse than just a stolen compressor, and I'm afraid that they're—maybe the police know something about something like this. They're making too big a fuss for it to be just a—a stolen compressor. There's something else they're after, and I don't know what it is, and I want to know—" At this point defendant asked Mrs. Ferris where she was and how to get there. He asked her if she had mentioned what she had just told him over the phone to anyone, and on receiving a negative reply observed, "I'm sure you've got your phone tapped, but I'll be out there and talk with you." He advised her to call the bail bondsman and then to get dressed and to pack and adopted her suggestion that she get out of the mess before they could ask her any more questions.

In his original statement to the district attorney on October 5th, defendant not only offered an explanation as to the horse, the saw, and the painting, but also in relation to a dog and a fence which he erroneously stated Mrs. Ferris had accused him in the telephone conversation of receiving with knowledge of a tainted source. He stated the first thing mentioned by Mrs. Ferris was the fire, and that she not only indicated that Wickholm had something to do with it, but that defendant knew he did; that he told her that if anyone asked her about these charges she would have to tell them. On that occasion he denied that he had told her to keep her mouth shut and not to talk about it, and that he had accused her of getting into the whole mess by talking about it.

Before the grand jury he stated that Mrs. Ferris said she was disturbed about some awful things Wickholm had stated defendant and he had done, including the fence and dog, along with the horse and saw, and that he may have advised her to get a lawyer or answer that she didn't know.

Following the phone call, he took his wife's five-passenger car and endeavored to find Mrs. Ferris. He apparently found the ranch and was observed there, but Mrs. Ferris had left with the district attorney's investigator. At the district attorney's office on the morning of October 5th he gave negative replies to questions directed to ascertain whether he made such a trip. He explained these answers by reference to the fact that the interrogator had given the wrong date in the question, that the questions referred to the ranch by a name with which he was unfamiliar, and furthermore because he did not want to give any statement without first consulting an attorney when he found the district attorney, with whom he wanted to talk, flanked by several assistants and other functionaries, and insisting on a record which defendant at that time did not want to make. In his statement later that day he acknowledged he had made the trip, but stated it was at her instigation rather than his own. Before the grand jury he acknowledged that he initiated the idea of going to see her; and that he found a house on the ranch which he entered and found empty. At the trial he stated that the purpose of the trip was to get to the bottom of the accusations she had made.

At 6:05 a.m., Wickholm telephoned the bail bondsman. He in turn made arrangements whereby defendant signed a release at 10:30 a.m. and Wickholm was released about an hour later.

According to defendant's statements he attempted to get an appointment with the district attorney that same day, but was unable to do so and left that afternoon for the annual Conference of California Judges.

He did call the insurance adjustor and advised him that he had received information that Wickholm had intentionally burned down the cabin and that he wanted to return the insurance money. A luncheon date was made for October 6th and subsequently advanced to October 2d on Hardeman's return from the convention. The insurance company did not want the refund, but was interested in its subrogated claim against those responsible for the fire.

Defendant arranged to see the district attorney on the morning of October 5th, but, as noted above, continued the matter until later in the day so he could confer with counsel. He gave

a statement in the presence of his attorney which was reported by a reporter selected by the latter. This statement was read to the jury and is consistent with defendant's testimony except as noted. Thereafter, defendant voluntarily appeared before the grand jury, and his testimony there was similarly read to the jury. The principal discrepancies between the facts contained therein and defendant's testimony have been alluded to above.

Meanwhile on October 1st and 14th, 1964, further investigation was conducted at the scene of the fire, and it revealed that the fire was of incendiary origin.

[In the latter part of October, after the indictment had been returned, Wickholm met witness Elderton in a restaurant and told her he had been looking for her so he could tell her what and what not to say.][5]

Such other facts as bear upon the issues presented are noted in connection therewith.

B. No prejudicial error was committed in the rulings on the evidence.

 1. There was no error in admitting the tape recorded telephone conversation between defendant and Ruth Ferris.

Defendant's original attack on the admission of evidence of his extrajudicial declarations is predicated on the theory that the interrogation, though conducted through the voice of a third person was substantially a process of interrogation that was designed, and lent itself to eliciting incriminating statements from a particular suspect upon whom the investigation of complicity in the crimes of arson, grand theft, and obstruction of justice had begun to focus. He contends that recently developed exclusionary principles preclude admission of the accused's declarations under such circumstances. (See *Massiah* v. *United States* (1964) 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246]; *Escobedo* v. *Illinois* (1963) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]; *People* v. *Dorado* (1965) 62 Cal. 2d 338, 345-357 [42 Cal.Rptr. 169, 398 P.2d 361]; and more recently *Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694].) Reliance was placed upon the opinion of the District Court of Appeal in *Ballard* v. *Superior Court,* as found in (Cal.App.) 44 Cal.Rptr. 291, 295-296. After hearing was granted in that case it was determined, "Since petitioner was clearly not in custody at the time he uttered the incriminating statements to the victim [who was cooperating

---

[5]See page 23 for footnote.

with the authorities, as the witness was here], he cannot successfully challenge the admissibility of those statements on the basis of *Escobedo* and *Dorado.*'' (*Ballard* v. *Superior Court* (1966) 64 Cal.2d 159, 170 [49 Cal.Rptr. 302, 440 P.2d 838]; and see generally pp. 167-170 and *People* v. *Bowman* (1966) 240 Cal.App.2d 358, 369-374 [49 Cal.Rptr. 772].) The People, in addition to directing attention to the fact that the defendant was not in custody at the time of the utterances, contest defendant's assumption that the proceedings had reached the accusatory stage. They assert that the telephone call was a legitimate method of investigation used to give the defendant a chance to reject or rebut the suspicions which had arisen in regard to his participation in the offenses under investigation. The lack of custody or restraint makes it unnecessary to resolve this point. (Cf. *People* v. *Jones* (1965) 237 Cal.App.2d 499, 503-504 [47 Cal.Rptr. 40].)

Defendant also urges that the evidence of this conversation offends the principle that ''if a defendant makes no response to an accusatory statement and by remaining silent is exercising his constitutional privilege against self-incrimination, it is error to admit the evidence. [Citation.] Under such circumstances the defendant's response cannot give rise to an inference of acquiescence in the truth of the statement or of guilty consciousness, and admission of the evidence constitutes error.'' (*People* v. *Ridley* (1965) 63 Cal.2d 671, 676 [47 Cal. Rptr. 796, 408 P.2d 124]; *People* v. *Cockrell* (1965) 63 Cal.2d 659, 669-670 [47 Cal.Rptr. 788, 408 P.2d 116].) It may be assumed that the interrogator was an agent of the authorities (see *People* v. *Polk* (1965) 63 Cal.2d 443, 449-450 [47 Cal. Rptr. 1, 406 P.2d 641]; and *In re Lopez* (1965) 62 Cal.2d 368, 370-371 [42 Cal.Rptr. 188, 398 P.2d 380]), but the situation differs from those in the cases upon which defendant relies, because defendant was not expressly or inferentially claiming any constitutional right against self-incrimination. Insofar as he gave an evasive reply to or failed to answer any accusation inherent in Ferris' remarks it was a product of his own free will. In fact the conversation reflects that if he had been able to ascertain the correct telephone number he would have initiated the telephone call, if not the express content thereof, himself. This is a far cry from the kinship to testimonial compulsion found in silence to accusations made in the police station after arrest.

Finally, defendant asserts that his declarations reciting or affirming his past conduct, which must be distinguished from his verbal acts (*Lutwak* v. *United States, supra,* 344 U.S. 604,

617-618), were not admissible because there was no proof of the corpus delicti. This question is hereinafter discussed in connection with the admissibility against defendant of the declarations of his coconspirators, and in connection with the sufficiency of the evidence.

2. There was no prejudicial error in admitting into evidence the declarations of defendant's alleged coconspirators or in the instructions of the court concerning their application to defendant.

Defendant complains that the jurors were temporarily permitted to consider as against him evidence of certain declarations of his alleged coconspirators, and that prejudicial error resulted therefrom. The record reflects that when the testimony was originally received the jurors were cautioned to consider each declaration only as against the defendant who allegedly uttered it. Thereafter, on the sixth day of the trial, following argument as to whether or not there was sufficient independent evidence from which it could be found that a conspiracy was established, the court instructed the jury as follows: "Ladies and gentlemen of the jury, at this time I am going to authorize you to consider, if you so desire, as against all of the defendants in the case, the testimony which has heretofore been limited to one or more of the defendants, . . ." After advising the jurors that they were the exclusive judge of the weight to be given the evidence, the instruction continued: "in your consideration of this evidence it will be necessary for you to bear in mind certain instructions which I will give you later in the case, but a few of which I will give you at this time because they bear directly on these matters which I am just discussing, and I will therefore read to you some instructions in the case and will repeat them again at the end of the case." The court then gave general instructions concerning proof of a conspiracy (see CALJIC (1958) No. 933, p. 617), evidence not admissible to prove a conspiracy (see id. No. 935, p. 619), effect of evidence of association alone (see id. No. 937-A, p. 620), and effect of termination of conspiracy (see id. No. 942, p. 624)[12] and concluded: "Please try

[12]These instructions read as follows: "The formation and existence of a criminal conspiracy rarely can be shown by direct evidence, and circumstantial evidence alone may support a finding of the formation and existence of a conspiracy.

"In determining whether an alleged conspiracy was formed and existed, it is proper to take into consideration the relation of the accused parties and their personal and business associations with each other, if any. You may consider all facts tending to show what, if anything,

to bear these instructions in mind as you consider this evidence.''

In instructing the jury just prior to final submission, the court, after giving a few general instructions and immediately preceding the reading of the indictment, gave the following instruction: ''During the trial of this case certain testimony has been admitted subject to certain limitations or subject to instructions that the jury could consider it as against one or more of the defendants and not as against others. It is your duty to endeavor to remember this evidence and the limitations which have been placed upon it. You should not consider any evidence as to any purpose for which it was not admitted, and you should not consider against any defendant in this case any evidence which was not offered against him, or which you were instructed not to consider against him. For the purpose of assisting you in recalling such rulings, I will direct your attention to some of the testimony so limited. It is possible that in so doing I may not mention all of the testimony so limited, but I shall endeavor to do so. Some of the limitations placed upon testimony were as follows: First: The testimony of Delores Elderton that the defendant Sherman showed her the cabin and said [December 5, 1964] that the fire had been started in an old bureau with paint thinner, rags and paper. Originally this testimony was admitted only against the Defendant Sherman. Later I ruled that it could be considered by you as to all the defendants. I now instruct you not to

occurred between the accused parties at or before the time of the alleged combination or agreement, or thereafter, in relation thereto. You may also consider evidence of the acts and declarations of said parties after the formation of the alleged combination or agreement, in respect to, and in pursuance and furtherance of, the alleged conspiracy.

''No evidence of an act or declaration of an alleged conspirator shall be binding upon or considered against any other alleged conspirator unless and until, independent and without the aid of such evidence, a conspiracy as alleged, and of which both such persons were members, has been proved to have been in existence at the time of such act or declaration; and no alleged conspirator shall be held criminally responsible as such for any act of another alleged conspirator when the only substantial evidence purporting to indicate an agreement between them is evidence of the acts and declarations of the latter.

''Evidence that a person was in the company of or associated with one or more other persons alleged or proved to have been members of a criminal conspiracy is not, in itself, sufficient to prove that such person was a member of the alleged conspiracy.

''No act or declaration of a conspirator that is committed or made after the conspiracy has been terminated by its purpose having been fully accomplished, or by its objective having ended, is binding upon his coconspirators, and they are not criminally liable for any such act or declaration.''

consider this testimony as against either the Defendant Hardeman or the Defendant Wickholm. All of this particular testimony is limited to the Defendant Sherman. Second: The testimony of Thurman Wariner and Clyde Wariner that after borrowing the truck the Defendant Wickholm said in effect that if anyone asked them if Wickholm had borrowed their truck, [June 1964] they were to say No, is limited to Wickholm only. Third: All testimony of Mrs. Betty Pires as to what Defendant Wickholm said during his visit to Summit City [to recover the compressor] is limited to Wickholm only. Fourth: The testimony of the Witness Hambaugh is limited to Wickholm only in two respects: First, his testimony that Wickholm told him that he had bought the compressor from one Albert Maddox. Second, his testimony that Wickholm said that he had two receipts and that they were in Miss Days' office. Fifth: The testimony of Joseph Schoales about the meeting of October 5th in Mr. Bergna's office is limited to the Defendant Hardeman. Sixth: The statement given by Defendant Hardeman in the District Attorney's Office which was taken down by James Robertson and was read to you by him is limited to the Defendant Hardeman. Seventh: The testimony of the Defendant Hardeman about the conversation at the Steak House with the Defendant Wickholm was not admitted as to the Defendant Sherman. In fact, all statements made by the Defendants Hardeman and Wickholm after the date of the fire are limited to them only and are not to be considered against the Defendant Sherman.''

Defendant insists that despite these limitations he was prejudiced. It has been generally presumed that the jury has followed the court's instructions, and specifically that the jurors have adhered to admonitions that evidence admitted against one defendant shall not be considered against another. (*People* v. *Rosoto* (1962) 58 Cal.2d 304, 326 [23 Cal.Rptr. 779, 373 P.2d 867]; and see *People* v. *Aranda* (1965) 63 Cal.2d 518, 524 [47 Cal.Rptr. 353, 407 P.2d 265].) *Aranda*, however, recognizes that the rule which so permits the admission of statements which are damaging to the codefendant as well as to the defendant against whom they are properly admissible is subject to criticism. (63 Cal.2d at pp. 526 and 528-531.) It found prejudicial error to the codefendant where a statement so received was erroneously admitted against the declarant defendant because the latter had not been advised of his rights to remain silent and to have counsel (*id.*, at p. 527). It then lays down rules for deletion of reference to a codefendant, or

severance of trials, or for exclusion as may be necessary to protect the nondeclarant codefendant (*id.*, p. 530). This does not answer completely the question raised herein, and in other conspiracy cases, where the declaration of one may or may not be admissible against another as the conspiracy and other facts may or may not be established. (See *Krulewitch* v. *United States, supra,* 366 U.S. 440, 453-456, Jackson, J. concurring.)

Of the declarations attributed to others, of which defendant complains, there are only a few which directly referred to defendant, but in each case the court limited the evidence to the alleged declarant. Sherman's girl friend testified that Wickholm, after telephoning on the morning following the fire, declared: "Maury said for once we've done something right. It's the first right thing we've done"; and that Maury was very surprised when he got the call about his cabin. She further testified to a declaration of Sherman, which was limited to him by the court, that he and Wickholm had burned the cabin because Wickholm owed appellant quite a large sum of money. Finally, defendant's name figured in conversations between Wickholm and the parties who had the compressor, but these negotiations are not denied by defendant.

A review of the remaining items collected by defendant reflects that their admission was not prejudicial because of their reference to defendant (see *Aranda, supra*), but because they tended to show acts or declarations incriminating Wickholm and Sherman which could only bind defendant if a conspiracy were established. Their effect then depends on the sufficiency of the evidence to establish Counts I and III.

It should be noted that the question herein is the application of the evidence of the declarations, not against the declarant, which is proper if the corpus deliciti has been established, but as against the codefendant as a coconspirator. It is conceded that there was sufficient evidence to support the establishment of the corpus delicti of arson—an incendiary burning. Any declaration of Wickholm, Sherman or defendant was admissible as against such declarant himself insofar as it tended to show his complicity in that offense.

When there is further evidence, as there was, to connect the defendant with the commission of the offense, those declarations of his codefendants may be considered against him.

Here the court ultimately refused to permit the jurors to consider the declarations of one against another. Nevertheless, since the jury found all the defendants guilty as charged on

the conspiracy counts under the limiting instructions, it would have been proper—assuming sufficient other evidence to sustain those verdicts—for the jurors to consider all of the declarations which were made in furtherance of either conspiracy. Under such circumstances the defendant cannot demonstrate or claim any prejudice in the manner in which the trial court instructed the jury in relation to the matters for which the evidence under consideration could be considered. The question of the sufficiency of the evidence, exclusive of the declarations to establish the corpus delicti of either or both of the conspiracies charged may, therefore, be determinative of whether there was possible prejudice to this defendant even if new exclusionary rules are adopted.

C. The evidence is sufficient to support the verdict.

██ ''A conspiracy exists where it is established that there was an unlawful agreement to commit a crime between two or more persons, accompanied by an overt act in furtherance of such agreement. [Citations.] ██ In proving the agreement it is not necessary to show that the parties met and actually agreed to undertake an unlawful act or that they previously arranged a detailed plan. ██ Generally a conspiracy can only be established by circumstantial evidence because the essence of a conspiracy—the unlawful design—can usually be proved only by the establishment of independent facts, bearing more or less closely upon the common design. [Citation.] ██ Thus, a conspiracy may be proved by indirect evidence and inferences justified by the circumstances. [Citations.]'' (*People* v. *Kefry* (1958) 166 Cal.App.2d 179, 185-186 [332 P.2d 848]; see also *People* v. *Phillips* (1960) 186 Cal.App.2d 231, 243-244 [8 Cal.Rptr. 830] and *People* v. *Miller* (1960) 185 Cal.App.2d 59, 74 [8 Cal.Rptr. 91].)

██ ''Conspiracies cannot be established by suspicions. There must be some evidence. ██ Mere association does not make a conspiracy. There must be evidence of some participation or interest in the commission of the offense.'' (*People* v. *Long* (1907) 7 Cal.App. 27, 33 [93 P. 387], as followed in *Davis* v. *Superior Court, supra,* 175 Cal.App.2d 8, 23.) ██ Where there is some evidence of participation or interest in the commission of the offense, it, when taken with evidence of association, may support an inference of a conspiracy to commit the offense. (See *People* v. *Miller, supra,* 185 Cal.App.2d 59, 72-74; *People* v. *Kefry, supra,* 166 Cal.App.2d 179, 186.)

1. The conspiracy to commit arson.

█ It is admittedly established that defendant's building was destroyed by an incendiary fire and that the corpus delicti of the crime of arson was established. It further appears that the structure in question was of little utility in the condition in which it existed before its destruction, that it was insured and that defendant collected the insurance proceeds after the loss. A client, who was indebted to defendant, and his assistant were painting at the ranch during the period when the fire occurred. They left their companions on a holiday night for a period encompassing the time that the fire started. Defendant had this client secure bids to present to the insurance company in connection with the claim for the insurance proceeds.

In connection with this claim the prosecution sets great store by the facts that the bids secured by Wickholm were "rigged," that defendant placed the proceeds in a special bank account and obtained a new passbook for the account shortly thereafter, and that no attempts were made to pay the proceeds to the bidder of the first deed of trust who held the insurance policy. The first circumstance can only be considered if it is established that defendant and Wickholm were coconspirators, or that defendant otherwise authorized this conduct of Wickholm. The second circumstance seems devoid of probative value when it is considered that the records of the insurance company would clearly reflect the payment to defendant beyond his power to conceal. As to the third, it would appear that it would be the responsibility of the insurance company to tender a draft payable to the proper obligee.

█ The incendiary burning and the collection of insurance may raise a suspicion of the owner's complicity but that suspicion must be weighed against commission of the act by a pyromaniac or prankster, or even, as contended herein, by a misguided friend. There was, however, other evidence properly before the jury tending to show defendant's complicity.

█ The corpus delicti of arson having been established, any admissions of defendant tending to identify him as a participant in the offense were properly admissible. █ Defendant's response to the accusatory statements of Mrs. Ferris, which are detailed above, permit the interpretation that defendant was guilty of complicity in the original offense. He apparently immediately attributed the arson of which Wickholm was accused in general terms to his own cabin, and immediately offered to and did take action to confront the accuser. For reasons best known to himself, he accepted her

accusation in relation to Wickholm as true (despite the fact that at the time of the fire electrical short circuit, or mischievous children, had been suggested as possible causative agents) and offered to return the insurance proceeds to the insurer. The jury heard the defendant's voice in the conversation with Mrs. Ferris, they were read his statements to the district attorney and to the grand jury, and they listened directly to him as a witness as he explained his remarks and his subsequent conduct. It was up to the jury to determine whether to accept his explanation or the justifiable inference that his declarations and conduct evidenced complicity in the crime which was committed.

It is true they were unable to agree in holding him as a principal for the substantive offense of arson. Hereinafter discussed is the question of whether the jurors were properly instructed as to the right to convict for conspiracy where the alleged coconspirator is not aware of or privy to a crime until after it is committed. ▇ The failure to agree on the substantive offense does not necessarily preclude a finding that the defendant was involved in the conspiracy. (See *People* v. *Buckley* (1962) 202 Cal.App.2d 142, 151 [20 Cal.Rptr. 659]; *People* v. *Yant, supra*, 26 Cal.App.2d 124-125 [78 P.2d 1042].)

▇ The foregoing evidence, relevant and competent as to him, being sufficient to sustain a finding of his complicity in the arson, the question arises how was the burning effected? The defendant was not present, so if he was involved he must have conspired with another, or others, who performed the actual act. ▇ Once his complicity is established the corpus delicti of a conspiracy is manifest. That being established, the declarations of any of the conspirators may be used to establish his own complicity as was permitted by the court. Furthermore, the declarations of each, insofar as they were in furtherance of the conspiracy, could be considered as against the coconspirators. The court, therefore, erred in favor of the defendants in ultimately restricting the evidence as it did, and the instructions given during the course of the trial were proper.

▇ It is, therefore, concluded that the evidence was sufficient to sustain defendant's conviction of conspiracy to commit arson and that there was no prejudicial error in the court's rulings on the admission of evidence.

▇ 2. The conspiracy to obstruct justice.

Among the overt acts charged in connection with this charge are six acts substantially the same as those alleged in connec-

tion with the conspiracy to commit arson. Insofar as they reflect complicity in the arson they demonstrate a motive for the conspiracy charged. The overt acts in the latter charge really commence with the meeting between Hardeman and Wickholm at the restaurant on September 9th. Mrs. Ferris' marriage to Wickholm precluded proof of matters concerning that meeting which were concededly brought out by her testimony before the grand jury. The remaining acts and declarations of the defendant as set forth above are said to be insufficient because they should be interpreted as demonstrating that defendant, when he advised Wickholm to go and get the compressor, and intervened with Pires to the end that Wickholm could get it back, was cooperating with the authorities to secure the return of the stolen compressor, and the apprehension, by surrender, of Wickholm; that his solicitude in not only fixing but arranging for Wickholm's bail was motivated by his recognition of the accused's constitutional rights and the normal performance of his duties; that his refusal to sign the search warrant was a well considered judgment that he might be disqualified in the matter; that his manifest concern about the receipt after he had been confronted with the affidavit for the search warrant was to secure it for the authorities; and that his advice to Mrs. Ferris to keep quiet was motivated by a desire to quiet the inaccurate accusations of an hysterical woman.

Here again the jury had before it all of the conduct and declarations of defendant, and his statements and testimony in explanation. The jurors did not have to accept his explanation. Although failure to accept his explanation would not supply defects in the People's case, the untarnished facts support the findings, implied in the verdict of the jury, that defendant advised Wickholm to effect the return of the compressor so that he would appear in a better light and could urge that he had purchased it, as he in fact stated on his first arrest, and show that purchase by a receipt; that when it became evident that the authorities knew Wickholm had a forged receipt he attempted to tip him off; and that when it became apparent that Mrs. Ferris was talking not only about the compressor, but also might talk about the fire, he attempted to have her remain silent.

The foregoing facts remain despite deficiencies of proof of allegations that defendant at the luncheon September 9th expressly told Mrs. Ferris not to talk, and told Wickholm to get a receipt for the compressor, and a failure to show any culpability in defendant's fixing bail for or receiving property from Wickholm.

The evidence is sufficient to sustain the conviction on Count I. It also permits of the inference that defendant and Wickholm were acting in concert, and justifies the admission of McGuire's testimony concerning the paper furnished Wickholm as against defendant.

IV. THERE WAS NO PREJUDICIAL ERROR IN THE COURT'S RULINGS IN GIVING AND REJECTING THE REGULAR INSTRUCTIONS.

■ A. The general instruction on the admissibility of declarations which was given at the end of the case, and which is set forth at length above (see topic III, B, 2), is criticized because it failed to expressly refer to witness Elderton's testimony concerning Wickholm's declaration about the phone call to "Maury" on the morning following the fire or to McGuire's testimony concerning Wickholm's request for his signature.

The former testimony was excluded as to defendant when it was offered and so is covered by the general directions in the first part of the instruction. The court acknowledged that it may have overlooked some incidents, and, if it did, counsel could well have assisted the court by requesting further elaboration. Furthermore, it was also subject to proper instructions given during and at the close of the trial.[13]

The latter testimony was admitted over objection. It was, however, subject to the general instructions that the declarations should not be admitted against other than the declarant unless a conspiracy was established. The conspiracy to obstruct justice having been established this evidence was properly admitted. Moreover, it may be noted, that there is other evidence to show that Wickholm had a receipt, and not a scintilla of evidence or even a contention that it was genuine. No prejudice could result from the admission of this cumulative evidence against defendant.

■ B. The jurors were told to consider each count in the indictment as a separate offense.[14] Defendant contends that there was only one general conspiracy, if any, and that this

---

[13]See fn. 12, *supra*, p. 38. In the final instructions the jurors were again charged in regard to the restrictions on the use of the declarations of an alleged coconspirator in language taken from Instructions Nos. 39-A, 932 (rev.), 935, 937, 937-A, 939, 942 and 943 (rev.) as found in California Jury Instructions, Criminal.

[14]"Each count set forth in the indictment charges a separate and distinct offense. You must state your finding as to each count in a separate verdict. The defendants may be convicted or acquitted on any or all of the offenses charged."

instruction was error. (See *People* v. *Nasworthy* (1949) 94 Cal.App.2d 85, 89-90 [210 P.2d 83].) The conspiracy to commit arson, as hereinafter appears, was allegedly completed when its collateral objective was attained by defendant's collection of the insurance proceeds. The conspiracy to obstruct justice had as an incidental objective, the concealment of the arson, and as such would overlap with any element of evading and resisting arrest that is inherent in the earlier conspiracy. (See *People* v. *Davis* (1962) 210 Cal.App.2d 721, 734-735 [26 Cal.Rptr. 903]; *Developments in the Law: Criminal Conspiracy*, 72 Harv. L. Rev. (1959) 920, 960-963.) Nevertheless, the principal objective of the second conspiracy was to shelter Wickholm from the charge of stealing the compressor, and the attendant offense of preparing a forged receipt or bill of sale. The two conspiracies being separate offenses, and involving separate, even though in part overlapping objectives, there was no error in instructing the jury to consider them separately.

C. The jurors were advised that evidence showing Wickholm's theft of the compressor could only be considered on the question of the motive, or knowledge of Wickholm and Hardeman in connection with the offense charged.[15] The instruction does not, as defendant asserts, brand him as a party

---

[15] "Evidence was offered in this case for the purpose of showing that defendant WICKHOLM committed another crime, to wit: Grand Theft, for which he is not on trial at this time.

"Such evidence was received for a limited purpose only. Not to prove distinct offenses or continual criminality, but for such bearing, if any, that it might have on the question of whether the defendants WICKHOLM AND HARDEMAN are innocent or guilty of the crimes charged against them in this action.

"You are not permitted to consider that evidence for any other purpose and as to that purpose you must weigh such evidence as you do all other in the case. The value, if any, of such evidence depends on whether it tends to show:

"That the defendants had a motive for the commission of one or more of the offenses charged against them in this action, or

"That the defendants possessed knowledge that might have been useful in or necessary to the commission of any of the crimes for which they are now on trial."

The following charge was also given at the request of one of the defendants, presumably Wickholm: "The defendant WICKHOLM is not on trial here for the charge of grand theft. He is a defendant in another indictment voted by the Grand Jury at the same time the indictments were voted here and that trial will be held later and you cannot convict WICKHOLM of grand theft in this case, and even if the evidence that has come in before you might prove to your satisfaction that WICKHOLM has been proven guilty beyond a reasonable doubt of the crime of grand theft, the fact that he may be guilty of grand theft is not proof, in and of itself, of the fact that he and the defendant MAURICE HARDEMAN combined together to obstruct justice."

to the theft of the compressor. Insofar as it is inconsistent with the instruction that certain evidence connecting Wickholm with the theft of the compressor could only be considered against Wickholm alone, defendant was not prejudiced thereby, because he has acknowledged throughout that he acted on the belief that Wickholm had taken the compressor without the owner's permission. Wickholm was entitled to the cautionary part of the instruction. Since Wickholm had told defendant of the theft there was no error in permitting the jury to consider this fact.

D. The court instructed the jury regarding the elements of larceny and receiving stolen property. (See CALJIC Nos. 220, 221 and 222; and Pen. Code, § 496.) It also stated: "A Municipal Court Judge has no power to issue an order of any kind that stolen property be turned over by any person to the person who stole the property." Defendant urges error because since it was acknowledged that Wickholm was not on trial for theft of the compressor, there was no necessity to give the instructions. The jury was, however, entitled to evaluate the criminality of Wickholm's conduct in considering the question of whether he and defendant had conspired to obstruct justice. The instructions also threw some light on the negotiations between Wickholm and Pires for the return of the compressor. Defendant complains that the giving of these instructions lent credence to the unsubstantiated charge that defendant received stolen goods from Wickholm, and also tended to suggest that he had some complicity in the original theft of the compressor. There is little warrant for these inferences, but if defendant believed they would be drawn he could have asked for an instruction limiting the application of the instruction to the conduct of Wickholm.

The instruction regarding the authority of the judge was apparently directed toward the admitted conversations with Pires regarding the return of the compressor. Defendant concedes that it correctly states the law, but claims prejudice because it fails to recognize the fact that the redelivery to the alleged thief was urged for the purpose of returning the property to its rightful owner, and the additional fact that the compressor was repurchased from Pires. The question of whether defendant was attempting to exercise his authority improperly in conversing with Pires was one to be determined by the jury from the testimony of Mrs. Pires and defendant and the jurors were entitled to know what authority he had.

E. The jury was instructed that a municipal court judge is not permitted to practice law in or out of court, and that certain particular acts, as set forth above (*supra*, pp. 9 and 10) could constitute perversion or obstruction of justice. The multiplicity of the improper, or for that matter legal, acts which may be done in furtherance of the conspiracy is only limited by the ingenuity of the offender and his coconspirator, and the circumstances which they must overcome to attain their ends. The conclusions, hereinabove expressed in connection with the pleadings, that the perversion or obstruction of justice is an offense in itself which may be manifested by numerous acts, demonstrates the propriety of the instruction as well as the pleading.

F. The court properly gave separate instructions on the general intent necessary for the crime of arson, and the specific intent necessary for conspiracy to commit arson, and conspiracy to pervert or obstruct justice, respectively. Since each crime was separately designated it would be superfluous to give an additional instruction setting forth the general distinction between the two types of intent, as urged by defendant.

G. The court correctly instructed the jury concerning admissions and confessions. (See CALJIC Nos. 29 Alt.; 29-A (rev.); 29-B Alt. (rev.); 29-C Alt.)

Although it may be error to give an instruction on confessions where no confession is involved, here there was a confession by Sherman, and no limitation on the instruction was requested by defendant.

H. The instruction on the necessity of proof of the corpus delicti before use of an admission or confession is concededly correct. Defendant complains that the jury was never advised of the nature of the corpus delicti of either of the conspiracies. They were advised: "For the purposes of this case you will consider a Conspiracy to be an agreement between two or more persons to commit arson or to pervert or obstruct justice or the due administration of the laws followed by an overt act committed by one of the parties to effect the object of the agreement." The sufficiency of these charges has been hereinabove discussed and established.

I. Defendant complains of a failure to give an instruction that Wickholm had a constitutional right to be released on bail. This principle was never questioned. Comment was addressed to the fact that defendant took it upon himself to get the bondsman for Wickholm, and showed no reluctance

in acting on his application for bail because of the possible disqualification, which he subsequently asserted was a ground for refusing to act on the application for a search warrant. Insofar as the proposed instruction stated that defendant's orders for the release of Wickholm could not be considered as overt acts, they overlook the principle that legal acts can be overt acts. (*People* v. *Saugstad, supra,* 203 Cal.App.2d 536, 549; *People* v. *Buono* (1961) 191 Cal.App.2d 203, 223 [12 Cal.Rptr. 604].) It was for the jury to determine whether the fact that Wickholm's constitutional rights were uniformly protected by defendant rather than some other judge lent any significance to other relationships between those parties.

J. Defendant offered two instructions on entrapment and an instruction that procurement of a search warrant without probable cause is a misdemeanor. (Pen. Code, § 170.) It is contended that the detective, having already secured the receipt, was attempting to entrap defendant into issuing a search warrant without probable cause. The instructions would be proper if defendant were so accused. Here the alleged evidence of guilt in the charges at issue is the defendant's failure to issue the warrant when he was confronted with evidence that the authorities ostensibly were seeking to recover a forged receipt from Wickholm, and his conduct thereafter. Neither the failure to issue the warrant nor his subsequent conduct was suggested by the officer.

K. Among the acts enumerated in its general instruction on acts which would constitute a conspiracy to obstruct justice the court included: "To unlawfully hinder, delay or obstruct any police officer in the discharge or attempt to discharge his official duty to investigate the commission of a public offense." Defendant offered an instruction predicated upon the provisions of section 148 of the Penal Code to the effect that the resistance must be by some threat or violence to constitute a substantive violation of the provisions of that section. (Cf. *In re Bacon* (1966) 240 Cal.App.2d 34, 51-55 [49 Cal.Rptr. 322].) The instruction failed to cover deception or passive resistance and was properly refused.

L. Defendant proffered an instruction on the consequences of a judge acting when he was disqualified. He wanted to show that such action was not illegal but merely rendered the proceedings void. Defendant was not charged with a criminal act because he fixed bail for Wickholm when he might have deemed himself disqualified. As noted, it was merely a circumstance in the relationship between the parties which

tended to establish along with all the other evidence that defendant was attempting to protect Wickholm. The instruction that "the only consequence" of such action was its effect on the proceedings would deprive the jury of considering defendant's judicial acts for Wickholm as a part of the entire tapestry.

No prejudicial errors are found in the giving or rejection of the foregoing instructions.

V. THE COURT ERRED IN ITS SPECIAL INSTRUCTIONS TO THE JURY.

On March 8, 1965, at 11:12 a.m., the jury, following instruction, retired for deliberation. At about 3:07 p.m., the same day, the jury returned for further instruction. They again retired at 3:30 p.m.

At 8:45 p.m., still the same date, a note from the foreman was sent to the judge. It read as follows: "Request for definition. If a person's first knowledge of a crime (arson) comes to him after the fact and if he fails to report this knowledge to the proper authorities, is he then guilty of the crime the same as if he had participated in the act?" The jury was returned into court at 9 p.m. The question was read and the court answered: "Now, the answer to that specific question is no. That's the answer to the question." The jury retired again at 9:05 p.m. At 10:08 p.m., the jury was retired for the night.

At 11:42 a.m. of the second day of deliberation, a further written question was sent to the court by the foreman. The question was: "If a defendant is thought to be a conspirator to commit arson, then is he guilty of arson through prior knowledge even though he wasn't at the scene." Discussion between court and counsel followed, in which the court indicated that, if a person joined the conspiracy after the arson were committed, he would not be liable for the arson itself. The jury was then returned to the courtroom at 11:46 a.m. and People's Instruction No. 34 was read.[16] The jury again retired at 12:17 p.m.

At 4:47 p.m., the jury once again returned, with a

---

[16]People's Instruction No. 34 reads as follows: "Every person who joins a criminal conspiracy after its formation and who adopts its purposes and objects, is liable for and bound by the acts and declarations of other members of the conspiracy done and made during the time that he is a member and in pursuance and furtherance of the conspiracy. A person who joins a conspiracy after its formation is not liable or bound by the acts of the co-conspirators or for any crime committed by the co-conspirators before such person joins and becomes a member of the conspiracy." (See Cal. Jury Instns., Crim. (rev. ed. 1958) No. 939.)

further question: "If an accused shares in the benefits of a crime with the perpetrators of the crime, but is not aware of or privy to any crime until after the crime has been committed, is he guilty of the crime of conspiracy?" The court replied as follows: "Now, unfortunately, that is not a question which can be answered yes or no. It's not that simple a question. I will try to answer it for you by reading to you four of the instructions I have previously read to you, and I think you will find the answer to your questions in these instructions. . . ." The court thereupon read People's Instructions Nos. 26-A, 28, 34 and 116.[17]

The foreman addressed a further question to the bench: "There was one thing that was bothering several members here, and that is after the word conspiracy is mentioned, the word to commit follows, regardless of what, and they seem to think that to commit brings them back to the original crime." The court thereupon reread People's Instructions 26-A and 27.[18]

Defendant contends that the foregoing erroneously left the jury free to find the defendant guilty of conspiracy to commit arson even though he had no knowledge of the commission of the crime until after the fire. The instruction twice reread to the jury stated: "A person who joins a conspiracy after its formation is not liable or bound by the acts of the co-conspirators or for any crimes committed by the co-conspirators before such person joins and becomes a member of the conspiracy." (See *People* v. *Weiss* (1958) 50 Cal.2d 535, 563-566 [327 P.2d 527] ; *People* v. *Phillips* (1960) 186 Cal.App.2d 231, 244 [8 Cal.Rptr. 830] ; *People* v. *Kefry, supra,* 166 Cal.

---

[17]No. 26-A is the instruction set forth in the text under IV. H, *supra*; No. 28 reads: "Each member of a criminal conspiracy is liable for each act and bound by each declaration of every other member of the conspiracy if said act or said declaration is in furtherance of the object of the conspiracy. The act of one conspirator pursuant to or in furtherance of the common desire of the conspiracy is the act of all conspirators. Every conspirator is legally responsible for an act of a co-conspirator that follows as one of the probable and natural consequences of the object of the conspiracy even though it was not intended as a part of the original plan and even though he was not present at the time of the commission of such act."

No. 34 is the instruction set forth in fn. 16; and No. 116 reads as follows: "If you find that any two or more defendants charged herein entered a conspiracy as defined in the instructions I have given you, the design, scope, object, duration and termination of the conspiracy is solely a matter for the jury to determine."

[18]No. 26-A is set forth in the text under IV. H, *supra*. No. 27 deals with the necessity of proof of an overt act substantially as set forth in California Jury Instructions, Criminal, Instruction No. 938.

App.2d 179, 192 [332 P.2d 848].) Defendant asks us to assume that some of the jurors clung to the belief, suggested by their question, that defendant was not aware or privy to the crime of arson until after it had been committed. The failure to agree on a verdict on the substantive charge of arson lends some credence to this assumption.

In application for rehearing defendant for the first time has directed attention to *People* v. *Feldman* (1959) 171 Cal. App.2d 15 [339 P.2d 888] and *Bollenbach* v. *United States* (1946) 326 U.S. 607 [66 S.Ct. 402, 90 L.Ed. 350]. From the latter it is clear that the colloquy between jury and court in the instant case precludes the assumption that the jury pursuant to that portion of Instruction 34, which is quoted above, found as a fact that defendant was privy to the conspiracy before the fire. In *Bollenbach* the opinion notes: ''The Government argues that the sting of error is extracted because there was proof, other than the erroneous 'presumption,' on the issue of Bollenbach's participation in the wrongdoing before the transportation of the stolen securities had ended. This is to disregard the vital fact that for seven hours the jury was unable to find guilt in the light of the main charge, but reached a verdict of guilty under the conspiracy count five minutes after their inquiry was answered by an untenable legal proposition. It would indeed be a long jump at guessing to be confident that the jury did not rely on the erroneous 'presumption' given them as a guide.'' (326 U.S. at p. 614.)

The failure to give an unequivocal negative to the question was error. In *Feldman* this court stated through Justice Tobriner: ''Respondent's argument that appellant adopted the previous acts of his fellow conspirators, making him equally *guilty* with the McClerkins of receiving the stolen cars, runs directly into this specific ruling of *People* v. *Weiss, supra,* 50 Cal.2d 535. Indeed, that decision expressly disapproves as to this issue *People* v. *Brumback* (1957) 152 Cal.App.2d 386 [314 P.2d 98], the very case upon which respondent relies. Appellant did not agree to receive any stolen property as a part of his sale of the license plates of the Ford and Mercury. Indeed, both the cars were already in the McClerkins' possession, and the crime of receiving stolen property had already been committed. *There can be no conspiracy to commit the past and completed act; appellant did not, and could not have joined the conspiracy for the consummation of an objective already accomplished.''* (171 Cal.App.2d at pp. 21-22; italics added; and see *Bollenbach* v. *United States, supra,* 326 U.S. 607, 611.)

The setting in which this error occurred demonstrates its prejudice.

No opinion is expressed as to whether the subsequent act of defendant in making claim and participating in the fruits of the arson if performed with knowledge of and the intent to conceal the felonious acts of the incendiaries would make him a coconspirator of a conspiracy to defraud an insurer under the provisions of section 556 of the Insurance Code or section 548 of the Penal Code. (See *People* v. *Trim* (1870) 39 Cal. 75; and cf. *People* v. *Loomis* (1962) 207 Cal.App.2d 229 [24 Cal. Rptr. 281] with *Nuffer* v. *Insurance Co. of North America* (1965) 236 Cal.App.2d 349, 355 [45 Cal.Rptr. 918].)

VI. There Was No Reversible Error In The Alleged Misconduct Of The District Attorney.

Defendant sets forth numerous specifications of alleged misconduct by the prosecutor; and alleges that by reason thereof he was denied a fair trial. The rules governing this assignment of error were recently collated by this court as follows: "Misconduct of the prosecuting attorney may not be assigned as error on appeal if it has not been assigned at the trial unless, the case being closely balanced and presenting grave doubt of the defendant's guilt, the misconduct contributed materially to the verdict or unless the harmful results of the misconduct could not have been obviated by a timely admonition to the jury. [Citations.] Subject to the foregoing two exceptions, it is the general rule that error predicated on the alleged misconduct of the prosecutor cannot be raised on appeal in the absence of (a) an assignment of such misconduct as error and (b) a request to the trial court to instruct the jury to disregard it. [Citations.] A mere objection to the allegedly prejudicial statements without a request to the court to instruct the jury to disregard them is ordinarily insufficient to raise the question of misconduct on appeal. [Citations.] 'Whether a prosecutor has been guilty of prejudicial misconduct must be determined in the light of the particular factual situation involved.' [Citations.]" (*People* v. *Ney* (1965) 238 Cal.App. 2d 785, 790-791 [48 Cal.Rptr. 265].)

A. References to the privileged witness.

Numerous assignments of prejudicial error are predicated upon the prosecutor's references to Mrs. Ferris, who, as has been noted, was a witness before the grand jury, became Mrs. Wickholm prior to the trial, and did not testify therein. The record reflects that the prosecutor unsuccessfully sought to

enjoin this wedding in proceedings taken against Wickholm prior to the trial.

█ In his opening statement the prosecutor first mentioned Mrs. Ferris as living with Wickholm on the O'Connell ranch in September 1964, when investigation of the theft of the compressor focused on him after Wariner's revelations concerning the use of his truck. The prosecutor stated there were conversations between Wariner and Mrs. Ferris when the police were looking for Wickholm, particularly on September 11th, and that on that day the sheriff's office then contacted Mrs. Ferris after hearing from Wariner. As a result of the conversation with Mrs. Ferris, investigation was launched in regard to what was said and done at and as a result of the September 9th luncheon meeting of defendant, Wickholm and Mrs. Ferris. He related that further phone calls from Mrs. Ferris on September 15th and 16th resulted in investigation of the fire; and that ''the evidence will show that at that meeting [September 9, 1964] the judge told the witness, Ferris, that if she were asked about it to say that she didn't know and not to talk . . . that the judge told them to get a receipt for the compressor.''

No objection was made to these portions of the opening statement at the time. Defendant now asserts that the statement went further than what Mrs. Ferris had testified to before the grand jury (extracts from the grand jury testimony, which are set forth in affidavits in the clerk's transcripts, indicate that the foregoing is not a substantial deviation from what she had related); and that they were made with knowledge that she would not and could not testify over the objection of Wickholm which was assuredly forthcoming.

It is obvious, however, that at this stage of the proceedings neither prosecutor nor court could absolutely predict, in the absence of objection from someone, that the privilege would be asserted. She was subject to a subpoena issued and served on her prior to her marriage. No misconduct is evident and since the reference was one that could have been checked by an admonition, it cannot properly be asserted now in the absence of some objection or notice to the court.[19] (See *People* v. *Ney, supra,* 238 Cal.App.2d 785, 800-801].)

Any doubt was soon removed. Following the noon recess, out of the presence of the jury, the attorney for Wickholm made

---

[19]Defendant, of course, had no status to claim the privilege which inured to the witness and her spouse, the defendant Wickholm. He could, however, have interrupted the proceedings to secure a determination of the position his codefendant was going to take.

the complaint which defendant now asserts, charged the prosecutor with misconduct, and moved for a mistrial. The court pointed out that the marriage alone did not disqualify her as a witness and denied the motion. (See *People* v. *Mathis* (1965) 63 Cal.2d 416, 426 [46 Cal.Rptr. 785, 406 P.2d 65].) Shortly thereafter, Wickholm's attorney advised the court that his client would object to her testifying and the court indicated that in view of the objection it was prepared to hold that she was not a competent witness and to so advise the jury. The following morning Wickholm's motion to suppress calling his wife as a witness was renewed. After extended argument, the court ruled that the wife could not be called as a witness in the case and strongly suggested that she should not be called to the witness stand. (Cf. *People* v. *Ney, supra,* 238 Cal.App. 2d 785, 799-800; with *People* v. *Solis* (1961) 193 Cal.App.2d 68, 77-78 [13 Cal.Rptr. 813].) The prior suggestion of the court that he advise the jury that she was not a competent witness was not mentioned at this time.

The foreman of the O'Connell ranch testified that he knew Wickholm and Mrs. Ferris when they were living together in San Jose before they moved to the ranch about the middle of July; and that after he talked to the sheriff's detective in early September he had a conversation with Mrs. Ferris about the compressor, and she was asked to talk to the detective. The detective confirmed that he conversed with the foreman on the 4th and the 11th of September; that in the latter conversation he was requested to contact Mrs. Ferris; and that he went to the O'Connell ranch and talked to the foreman and to her on that day. ▉ Defendant assigns as misconduct the prosecutor's questions designed to elicit the substance of the conversation with Mrs. Ferris. His objection was sustained. "[N]o prejudice occurred by the asking of questions to which objections were sustained. The jury was instructed that it was not to conjecture as to what the answer might have been or the reason for the objection." (*People* v. *Saugstad, supra,* 203 Cal.App.2d 536, 546.) This same witness testified that he talked to her three times on the telephone on the night of the 11th; that he received telephone calls from her on the 15th and 16th; that following a telephone call on that day had a meeting with her on the 19th in San Jose; and that written statements were taken from her on the 11th and 19th. The foregoing was admitted without objection except for an interjection by defendant's attorney which appeared to be a protest designed to preclude admission of the content of the con-

versations. The written statements were produced and marked for identification, and then offered into evidence. An objection to the hearsay testimony and an assignment of the offer as misconduct were interposed on behalf of each of the defendants. The court observed: ''The statement is not admissible, and I would be very much surprised to learn that you didn't know that, Mr. Hoffman. However, I will deny the assignment of misconduct. You may proceed.''

Subsequently it was brought out that the statement taken September 11th was three pages in length and contained information about the compressor, including the exact location where it could be found. Objection to naming Mrs. Ferris as the source of further information was sustained, but it was brought out, without objection, that prior to Wickholm's arrest on the 12th the authorities had acquired all the particulars about the compressor's location from the day after it was stolen, through its disposition and Wickholm's trip to recover it, to the anticipated return on the night of September 11-12.

On cross-examination of the detective, defendant introduced the affidavit presented and the search warrant issued shortly after midnight on the morning of September 25th. The affidavit recites: ''Affiant has been informed by a reliable confidential informant who would be in danger were the name revealed that on or about September 9, 1964, said Wickholm obtained a forged and fictitious receipt at Santa Clara County Hospital from one, Mr. McGuire to use as an alibi and to introduce through perjured testimony at the coming trial. Said informant has given affiant other information concerning the theft in Santa Clara County which has proved reliable and which has previously been personally verified by affiant as true. . . . Affiant is further informed and believes that said Wickholm is considering destroying said receipt at any time and he carries it on his person. Affiant knows said Wickholm to be at the above residence at the present time and desires to search at night because of positive information that said receipt is with said Wickholm, is now at said residence and may destroy said receipt at any time.'' He further brought out that Mrs. Ferris was the informant referred to in the affidavit.

Mrs. Ferris next appears at the O'Connell ranch at the time of the service of the search warrant and the arrest of Wickholm. The district attorney's investigator conferred with her, asked her to cooperate in efforts to obtain evidence, and secured her consent to eavesdropping on and recording any

calls on her telephone. She then participated in the telephone conversation which has been fully alluded to above. Defendant brought out that she left the ranch in her own car followed by the investigator, and that lodging for her and her children was arranged for by the authorities until the grand jury hearing came on; and that although the place was kept secret she was free to contact anyone she cared to.

In an attempt to impeach McGuire, who had testified he wrote "Albert Maddox" at the request of Wickholm on a blank piece of paper which later turned up as the receipt for the compressor, defendant called McGuire's attorney as a witness. The attorney testified that the district attorney had agreed to guarantee McGuire criminal immunity and to dismiss a pending charge, that he and Wickholm conspired to pervert and obstruct justice by issuing and obtaining a forged receipt for personal property, if he testified in the instant case; but that in accordance with an understanding with the prosecutor he had not yet so advised him and merely told him that it would be advisable for him to testify. In cross-examining the attorney, the prosecutor brought out that after he had served McGuire with a subpoena, the attorney appeared and told the prosecutor his client did not have to testify. The following then occurred: "Q. All right. I told you we were over a barrel because they got Ruth Ferris out of the case by marrying her mouth shut? MR. BURNETT: I object. MR. HOFFMAN: Just a minute. We have a right to go into our understanding with counsel here. THE COURT: Go ahead. Q. (By Mr. Hoffman): All right, and I told you that they had us over a barrel because they had this Ruth Ferris and they married her mouth shut, so she couldn't testify, is that correct? MR. BURNETT: Now, I object to that question as being testimony from Mr. Hoffman. MR. HOFFMAN: It's cross examination. THE COURT: The witness may answer whether the statement was made. A. That statement was made, yes."

Defendant complains that the use of the "they" and as well the accusation contained in the statement is a bare-faced attempt to manufacture evidence in support of the four overt acts which charge him with attempting to silence Mrs. Ferris. The acts charged allegedly occurred on the 9th and 25th of September 1964, but they would be corroborated by the fact, if it were a fact, that appellant had further conspired to secure a sham marriage between Ferris and Wickholm to seal the former's lips. Not only is there no evidence to support such a thesis, but the marriage would not seal her lips if defendant

were separately tried. (See *People* v. *Albritton* (1930) 110 Cal.App. 188, 193-194 [294 P. 76].) The People urged that it was proper cross-examination to bring out all of the conversation so that the reasons for the prosecutor's grant of immunity could be fully explained. There was no need for explanation on this collateral matter and the bald hearsay accusation was not only inadmissible but prejudicial. The court's erroneous ruling admitting the question and answer tends to support the view that the proffer was not deliberate misconduct. The impact of this error in the admission of evidence must be weighed in the overall picture of the phase of the case involving Mrs. Ferris-Wickholm.

Defendant testified that Mrs. Ferris told him in a telephone conversation that the sheriff's detective objected to his having intervened in the Wickholm matter by the calls he made on September 10th. In cross-examination the prosecutor asked defendant, without objection, whether he knew where she was, whether he had a discussion with her about getting married, and whether he cautioned Wickholm about getting a divorce decree before remarrying. The last question provoked both a discussion as to whether defendant had so stated in June of 1964, and an objection to the form of the question. The other questions produced negative responses and the information that defendant had not seen or heard from her since September 25, 1964. An examination of this exchange as a whole fails to support defendant's charge that this was a studied attempt to create the impression that defendant had participated in an action to ''silence'' Ferris by marriage to Wickholm.

In his opening argument to the jury the prosecutor alluded to Mrs. Ferris as follows: that it was obvious what she told the sheriff's detective around September 11th; that her statement of September 19th was followed by investigation of matters relating to the fire; that according to McGuire, Wickholm said she was outside at the time he obtained the ''Albert Maddox'' signature; that if they wanted to get defendant they could dismiss as to Wickholm and call Ferris as a witness; that the tape was replete with references of defendant's instructions to silence Ferris; and that there were discrepancies in defendant's denial of such attempt in his statement to the district attorney. The only objection to the foregoing was in connection with the prosecutor's suggestion that since Ferris was outside in the car when Wickholm got the receipt she would know exactly when they got it. The objection was sustained and the prosecution was limited to showing that she was

present to the exclusion of speculating as to what she might have seen or heard.

In closing argument the prosecutor answered an argument that the authorities were ''out to get'' defendant by reference to the rejection of the possibility of dismissing as to Wickholm so as to use Mrs. Ferris as a witness against defendant. The defendant's objection and assignment of misconduct were overruled and in the colloquy the prosecutor pointed out that none of her statements were being offered, and that her questions and declarations in the telephone conversation were not evidence, but could only be considered as they elucidated defendant's answers. The prosecution subsequently again alluded to information received from Ferris on September 11, 1964, following the meeting on the 9th between Wickholm and defendant at which she was present. An objection was sustained before anything was adduced, and the advocate was directed to proceed on and did so.

Defendant's first complaint is that the presentation and admission of the statement ''we were over a barrel because they got Ruth Ferris out of the case by marrying her mouth shut'' and related incidents demonstrated a steadily, persistently developed plan to convince the jury that defendant had participated in a plot to silence the witness by promoting her marriage to Wickholm. The record which has been set out at length fails to sustain the charge. The statements in question appear as isolated incidents in a voluminous record, and the references suggested in the arguments of the prosecution nowhere reflect that such a point was urged, or could have been a material consideration presented to the jury.

Secondly, it is urged that the references to the facts that conversations took place between Mrs. Ferris and the authorities, and that she furnished them two written statements was prejudicial misconduct because it permitted the jurors to speculate as to what she did know, what she told the authorities, and what she might have testified to. There was no objection to proof of the foregoing facts, and on the two occasions where an attempt was made to go into the content of a conversation and the statements, respectively, objections were promptly sustained. The court properly controlled the admission of evidence and argument in confining it to those objective incidents which threw light on the acknowledged proven relationship between defendant, Wickholm and Mrs. Ferris. No misconduct or error is found.

It may be noted that the defendant was only an incidental

beneficiary of the failure of the prosecution to secure Mrs. Ferris as a witness. If he had to be retried because of errors in the treatment of her immunity at the trial under review, he would be bereft of this advantage because the conviction of her spouse would have become final.

██ B. Alleged unwarranted charges and innuendoes against defendant.

1. In the opening statement the prosecutor alleged that the evidence would show that defendant told Wickholm to get a receipt for the compressor. The clerk's transcript reveals that Mrs. Ferris allegedly testified before the grand jury that Wickholm had said that the judge had advised him to get a receipt; that she heard very little mentioned about the receipt at the luncheon, and that just as they were leaving the booth in the restaurant defendant said to Wickholm, ''Be sure and get that receipt.'' It was only after the opening statement that it was ascertained that Mrs. Ferris-Wickholm's competency to testify would be challenged.

Defendant was cross-examined on the basis of the revelations Mrs. Ferris had made to the grand jury, including the alleged statement quoted above, which defendant then denied having uttered. The examination then proceeded on an argumentative basis on the subjects of whether or not defendant knew or should have known that a criminal offense had been committed, and his concept of the significance of a receipt. This examination was interrupted by defendant's objection to the conclusionary form of a question, which was sustained, and a recess in the proceedings. Thereafter the prosecution again attempted to establish that defendant knew Wickholm had committed theft, and that defendant knew of a so-called ''missing man'' defense whereby the accused would claim innocent acquisition of stolen property from a third person, and would attempt to support such claim with a receipt. Defendant's objections to argumentative questions were sustained when made, and in the course of this exchange defendant's counsel participated in bringing out portions of defendant's original statement to the district attorney, which showed that Wickholm had told defendant that he had or could get a receipt. Throughout his statements and testimony defendant insisted that he told Wickholm not to rely on or be concerned with a receipt. There was no misconduct in this cross-examination.

██ The testimony of McGuire and of the arresting officers reflect that a receipt was secured and was found on Wick-

holm's person. The sole evidence which reflects any complicity of defendant in this phase of the case is his refusal to sign the abortive search warrant and his subsequent conduct including the manifest concern about the receipt which is revealed in the recorded telephone conversation. In addition the evidence supports the inference that the foregoing course of events ensued after a luncheon meeting at which defendant admittedly was consulted for the purpose of answering Wickholm's question, "What should I do?" and at which there was admittedly some dicussion concerning the efficacy of a receipt which Wickholm had or could get.

Defendant objects to the prosecutor's assertion that he must have known the receipt was "false and phony" because of his experience in the criminal law. This statement occurs at the conclusion of a lengthy section of the argument in which the prosecutor reviews the evidence referred to in the preceding paragraph and asks the jury to infer that defendant knew of the existence of a forged receipt, and, contrary to his statements, knew that it had been planned to use it for Wickholm's defense.

There is nothing in this approach which transcended the scope of legitimate argument.

In an attempt to show that defendant knew that Wickholm was of bad character the prosecutor referred to the fact that defendant originally represented him in a suit in which Wickholm was accused of forgery, and that although the matter was concluded successfully for Wickholm it might have been a miscarriage of justice. On the same theme it was suggested that defendant knew Wickholm was a thief because he received feed from him and the practice ceased after the incident in which Wickholm had been accused by the feed company. Reference was also made to the fact that the origin of the paint and other things furnished to defendant by Wickholm was not explained and that defendant had changed his story about the source of some deer meat he originally said he received from Wickholm. The prosecutor was careful to point out that defendant was not charged with receiving stolen property, but merely the receipt of personal property from Wickholm.

No objection was made to any of these remarks. They do exceed the bounds of the proved facts in some particulars, and the inferences which the prosecutor requested the jurors to draw were remote. The inference of unproved misconduct on the part of the defendant, or Wickholm, could have been obviated by timely admonition to the jury. The prosecution was

entitled to show the relationship between defendant and Wickholm as it bore on the question of the existence of the conspiracy, and the basic transactions which admittedly occurred were properly before the triers of fact. In view of the evidence bearing on the actual forgery of the receipt and the events attendant to the fire and the compressor theft, it cannot be said as a matter of law that these improper arguments of the prosecutor contributed materially to the verdict. It is inconceivable that the jurors would have found Wickholm of good character in the absence of these remarks, or that in view of defendant's acknowledged appraisal of his client as one whose life story consisted of a series of serious incidents in which he was ''in a bind,'' they would have absolved defendant of any knowledge of the acts alluded to in the argument.

The prosecutor also attempted to impugn defendant's treatment of the insurance proceeds by cross-examining him concerning his knowledge of the right of the mortgagee to the proceeds, his failure to notify either the first or second mortgagee of the loss, and the fact that the newly issued bank book did not cover the deposit of those funds. These matters were all satisfactorily explained, and it cannot be said that the prosecutor's excessive zeal, if it be termed such, in dangling these red herrings before the hooks of the expectant jurors diverted their attention from angling for more relevant catches for the creel of their consideration.

The prosecutor's statements regarding defendant's participation in Wickholm's dealings with Pires to recover the compressor are also attacked. In the opening statement it was asserted without objection that defendant got on the phone at Wickholm's request and told Pires that he had to give it back; that it was stolen and that if he did not give it back he would be receiving stolen property; that defendant put all the pressure he could on Pires; and that he indicated to him he was going to get out an order of repossession. In closing argument objections to the prosecutor's statement in like vein were overruled in part and the prosecutor was permitted to assert that defendant advised Pires he would be guilty of receiving stolen property if he did not return it. The evidence showed that Mr. Pires was in the hospital at the time of trial and unable to testify to this conversation; that Wickholm on the evening of September 10th made a phone call ostensibly to defendant and he and Mr. Pires each talked on the phone; that there was a second phone call that same night; and two more phone calls on September 12th to the same number. In his statement to the district attorney defendant acknowledged

that he talked to Pires and said, "The compressor is said to be stolen, and now if you keep on—if you retain it now after knowledge of it, —you can be charged with stolen property." He gave similar testimony to the grand jury. At the trial defendant related that he told Pires the foregoing would depend on the circumstances, and he denied that he ever threatened him with a court order. From the record it appears that the prosecutor believed that Mr. Pires, if available, would so testify.

It is questionable whether any misconduct could be predicated upon the foregoing record. In any event, the important point was that defendant did intervene with Pires on Wickholm's behalf, and error in the recital of the particular phraseology would not appreciably affect that fact or the inferences to be drawn therefrom.

The People's argument pointed out that it is advantageous to have the accused bailed out as soon as possible to reduce the period in which he may be subjected to police questionings and related it to defendant's actions in arranging for defendant's release. No error is perceived in this argument. The jurors were advised that Wickholm was entitled to bail and that defendant could not properly refuse to admit Wickholm to bail.

In his opening argument the prosecutor was attempting to trace repetitive types of activity or a modus operandi in the conduct of each of several of the actors in this drama. In respect of defendant he compared defendant's advice to Wickholm to return the compressor as soon as possible with his own subsequent action in offering to return the insurance proceeds after hearing Mrs. Ferris' accusation. In drawing this parallel the prosecutor alluded to what a "smart lawyer" would do. The matter was not objected to and taken in its context neither the categorization of defendant, nor the substance of the argument appear to exceed the bounds of propriety.

In his opening statement while advising the jury the prosecutor asserted that defendant had given a statement to the district attorney on October 5th and had testified before the grand jury on October 7th, that much of the original statement to the district attorney was "flatly untrue." This assertion was made without objection, and in view of all of the matters presented to the jury and the instructions of the court, it cannot be deemed that it swayed the case. In fact,

there were material inconsistencies between that statement and other evidence in the case, including the testimony of defendant before the grand jury and at the trial.

Considerable time was spent on direct and cross-examination in reviewing defendant's education and experience. In fact the court remarked: ''I am at a loss as to what you gentlemen are trying to prove here, but if you want to use up the time—.'' The court may have opened this Pandora's box when it properly overruled the objection to the prosecution's question concerning the year of defendant's admission to practice on the grounds that on direct examination he had expressed some opinions based on his status as a lawyer. The rest of the information was elicited without objection. Defendant's present complaint that it was error to permit the prosecution to show on cross-examination that he dropped out of school for poor grades while attempting to work and study law is neither timely nor meritorious.

Defendant objects to the expletive ''girl friend'' as used in the prosecution's opening statement to refer to a former client who, as her testimony revealed, on numerous occasions had lunched with defendant to discuss her case, had accompanied him to San Francisco to see a client and for dinner, and had spent two hours in the main house on the ranch with him listening to records. Coupled with this objection is criticism of a statement in the prosecutor's opening argument wherein it is implied that if the jurors found fault with the character of the witnesses it was because the defendants were ''low-class people'' and had ''low-class friends.'' Each of these references is said to constitute ''a sleazy innuendo of sexual misconduct.'' It is questionable whether the last reference when viewed in context applied to defendant, or only to Wickholm and Sherman. In any event, no more importance should be attributed to them than was displayed by defendant's counsel who interposed no objection or request for admonition, which would readily have rectified any erroneous impression to the jury.

C. Failure of proof.

In addition to the matters which he claims were overstated in the opening statement as to the testimony of Mrs. Ferris, and in respect of the evidence against him, defendant asserts prejudicial error because it was stated but not proved that the insurance claims adjustor to whom he tendered the return of the money would testify that defendant in making the tender stated that he knew it had to be true that Wickholm

started the fire. The testimony was that defendant did not so state. There is nothing to show any bad faith or misconduct by the prosecutor. Regardless of what he may have said the fact remains that on the morning of September 25th he wanted to pay back $2,000 on the basis of the knowledge he then had. What he said about that knowledge could not be more probative or decisive. The question in issue was his motive.

Secondly, the prosecutor stated that witness Elderton would testify that on the completion of the November 29, 1963 morning phone conversation, Wickholm told her and Sherman that defendant had related on the telephone, in addition to the declaration hereinabove noted, that ''he put on quite a surprise act about it when it happened, and that they would never connect him with it because he was up in San Jose at the time it happened.'' In her testimony she related that Wickholm recited: ''Maury was very surprised when he got the call about his cabin.'' The promised testimony that ''Maury says that's the only thing we ever did right'' was produced. Since it conveyed the inference that something had been done for ''Maury,'' the unproven statement, could at best, have had a cumulative, not a decisive, effect. No error is shown.

D. Other alleged errors.

Defendant claims prejudicial error and misconduct because an offer of proof was made and accepted that the witness Wariner would testify that after the indictment Wickholm told him: ''People are after me, I have too much on them, I'm going to be shot.'' When permitted to testify, he stated: ''he said he felt he was going to be shot and he didn't have long to go, that he had two [sic]—that Mr. Hardeman —he had too much on Mr. Hardeman.'' The court in response to defendant's objection promptly struck the reference to him and admonished the jury to disregard it. Defendant now claims misconduct and alleges that the prosecutor should have known of this answer. The witness, however, had not been examined in court in connection with the offer of proof. The record indicates that at a noon recess he was excused by court and counsel with the jurors with instructions to return at 2 p.m., at which time the court promptly reconvened. Under the principles set forth above it will be presumed that the jurors heeded the admonition, and that there was no bad faith on the part of the prosecutor which requires deviation from the general rule.

Complaint is made because the prosecutor attempted to establish the general practice of the local judges in regard to the issuance of search warrants. Objections were sustained to the questions propounded and the witness was dismissed. No error or misconduct is shown.

The prosecutor commenced to call two expert witnesses. The defendant's counsel acknowledged, out of the presence of the jury, that he had retained them to investigate the fire, and sought an order which would preclude the prosecution from using this testimony because it was privileged and confidential. The court ruled for the defendant.

Despite this ruling the prosecutor sought to cross-examine defendant in regard to whether he had experts examine the premises. The defendant denied any knowledge of that activity, and an objection to a question about the aforementioned acknowledgment of his attorney was sustained. The questioning was not otherwise objected to, nor was any motion made to strike it.

In closing argument the prosecutor suggested that defendant could have obtained an expert rather than relying on lay witnesses to rebut the testimony that the fire was incendiary in origin. In so doing he mentioned the name of the expert which had been pronounced in front of the jury before the aforementioned motion was considered. No objection was made and no error appears. It was proper to compare the effect of lay and expert witnesses on the issue in question, and the prosecutor did not, as suggested by defendant, infer that defendant was' withholding unfavorable reports. In any event, the evidence of the incendiary nature of the fire was not opposed by any substantial evidence, and an error in reference to the existence of this evidence, which was apparently unfavorable to the defendant, could not have been prejudicial.

Finally, misconduct is alleged in references in closing argument to the failure of Wickholm and Sherman to testify. The first reference was to the fact that they were always talking and apparently were adduced to impress the jurors with the truth of the evidence that they had made declarations concerning the offenses in question. The sentence, ''The only place they don't talk is on the witness stand'' was not uttered in the prohibited sense that they should be called upon to explain the testimony against them.

In the second reference, the attorney was discussing the period in which Wickholm and Sherman were allegedly gone from the Red Barn, and their whereabouts at that time. He

stated: "Now, there are people who know, a couple of them are in the courtroom real close. Nobody, nobody, nobody said where they were." This hardly rises to the level of *Griffin* v. *California* (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106]. If it did the objection would be with Wickholm and Sherman, and it would be up to defendant, if he deemed himself injured by the reference, to interpose an objection and seek an instruction from the court to protect himself from any adverse inference drawn against his alleged coconspirators.

It is true that the case was tried before *Griffin* was decided, but counsel were aware of the problem. Immediately following argument, the court and all counsel discussed the propriety of giving an instruction on the failure of a defendant to testify. The court felt compelled to give it because of *People* v. *Modesto* (1965) 62 Cal.2d 436 [42 Cal.Rptr. 417, 398 P.2d 753], but with commendable foresight preferred not to because of evolving principles in the Supreme Court of the United States. All counsel agreed that no instruction should be given or any comment made. If defendant felt aggrieved by the remarks made in argument this was the time to speak up. No prejudicial error is found.

E. Conclusion.

The bare recital itself of these alleged errors may create the impression that if all are thrown on one side of the scale prejudicial error is manifest. It is true that a pound of feathers outweighs a half-pound of lead. But the volume of a pound of feathers can be offset by a small volume of solid metal. So it is here; the objections, being unsubstantial, cannot tip the scale. The claims of errors which can be sustained are few, and no prejudicial misconduct warranting a reversal is found.

VII. DEFENDANT WAS NOT ERRONEOUSLY SUBJECTED TO DOUBLE PUNISHMENT.

 Defendant was convicted on Counts I and III and in the order granting probation separate, albeit overlapping, terms of probation were imposed. He claims that since six overt acts are common to both conspiracies, he can only be punished under one conviction under the terms of section 654 of the Penal Code. (See *In re Romano* (1966) 64 Cal.2d 826 [51 Cal.Rptr. 910, 415 P.2d 798]; *People* v. *Quinn* (1964) 61 Cal.2d 551, 555-556 [39 Cal.Rptr. 393, 393 P.2d 705].)

The reversal of Count III may render this point moot. The discussion above in connection with the sufficiency of the allega-

tions of Count I of the indictment and in connection with the instructions demonstrates that the offenses charged in Count I and Count III were severable.

The case was lengthy and its analysis on appeal has proved equally so. As in all criminal cases the stakes were high, and the record itself importunes painstaking analysis. Such an analysis has been made and reflects that the trial was conducted with learning and patience, and was, with the exceptions noted, fair to the defendant. The evidence permitted an interpretation which would brand the defendant not a criminal, but a good Samaritan, improperly capitalizing on the misguided crime of his client, and unethically repaying him with minor favors. The jury rejected this approach, and found the culpability necessary to convict, a conclusion which is sustained by ample evidence, but which as to Count III is found to rest on a false legal hypothesis.

The principal arguments advanced by defendant "involve a reweighing of the evidence and it is fundamental that appellate courts must assume in support of the judgment the existence of every fact which the jury could reasonably have deduced from the evidence. [Citation.] The fact that these same facts could also be reasonably reconciled with the innocence of the defendant, assuming for the moment that they could, would not warrant a reversal. [Citation.]" (*People v. Danielson* (1962) 203 Cal.App.2d 498, 506 [21 Cal.Rptr. 469].)

The order granting probation is affirmed insofar as it rests upon defendant's conviction of the offense charged in Count I, and reversed as to the conviction of the offense charged in Count III. As the terms of probation for both convictions are merged in a single order, the trial court is ordered to review and, insofar as it deems it just and proper, modify the terms of the order granting probation which is affirmed. The purported appeals from the denial of the motion for new trial and motion in arrest of judgment are dismissed.

Sullivan, P. J., and Molinari, J., concurred.

A petition for a rehearing was denied September 2, 1966, and the opinion and judgment were modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied November 23, 1966.